(No. 43604.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. JAMES A. TURNER, Appellant.

*Opinion filed Nov. 30, 1973.—Rehearing denied Jan. 29, 1974.*

Brizius & Nixon, of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel, Assistant Attorney General, and Kenneth L. Gillis and Linda West Conley, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County defendant, James A. Turner, was found guilty of the offenses of murder and attempt rape and sentenced to the penitentiary for consecutive terms of not less than 74 nor more than 125 years on the murder conviction, and not less than 10 nor more than 14 years on the conviction for attempt rape. The evidence shows that the partially clad body of the victim, Mrs. Sylvia Sewell, was found in the basement of her antique shop in Evanston, and that the cause of death was a severe laceration of the throat. The record is voluminous, defendant has briefed and argued a number of grounds for reversal, and the evidence and the contentions of the parties will be discussed only to the extent necessary to this opinion.

As grounds for reversal defendant contends that the trial court erred in denying his motion to suppress two written confessions and in admitting them into evidence. He argues that they were not made voluntarily for the reason that there was no knowing and intelligent waiver of his right against self-incrimination. The record shows that in a competency hearing the jury found defendant

competent to stand trial, that approximately one month later the trial court conducted a hearing on defendant's motion to suppress the confessions, and it was stipulated at that time "that all the testimony that was heard prior to this time is all part of this record." At the conclusion of the hearing the court found that there was no coercion, physical or mental, and denied the motion.

Testimony adduced at the competency and suppression hearings shows that at the age of 8 defendant entered the Polk State School for mentally retarded children in Pennsylvania and that his stay there was terminated when he escaped at the age of 18. On admission he scored 77 on an IQ test. Approximately 3 years later a second test indicated an overall IQ of 75 and a verbal IQ of 65. At the time he left the institution he had "a borderline mental capacity." At age 13 he had attained an educational level of between third and fourth grade. A clinical psychologist testified that on a Wechsler Adult Intelligence Scale type of IQ test administered several months prior to the competency hearing defendant's verbal IQ score was 70 and that this placed him in the "borderline intellectual range," in the bottom 10 percentile of the population.

Two attorneys who had been appointed to represent defendant withdrew and testified at the competency hearing. They testified that defendant did not know the name of the Methodist Camp Grounds Hotel where he had most recently lived or its exact location, or the name or place of residence of his fiancee. He was unable to relate his activities or the names of persons whom he had seen on the day on which Mrs. Sewell was killed. He was unable to spell his middle name, Arthur.

In the course of investigating the case Evanston police officers learned that defendant and his employer had done some carpenter work in the deceased's shop approximately one month prior to her death, that a man fitting defendant's general description was seen in the vicinity on the day of the murder, that defendant had quit his job

several days prior to the murder, that he had called his employer on the telephone concerning some wages due him and had called later to ask that his wages be mailed to an address in McKeesport, Pennsylvania. Two police officers went to McKeesport and at the request of a police officer there, defendant came to the police station at about 1:00 P.M. The police officers testified that defendant was told that they were from Evanston, Illinois, and were there investigating the murder of Mrs. Sewell. They advised defendant of his constitutional rights and shortly thereafter his sister came into the police station whereupon he was again advised of his rights. The police officers advised him that he was not required to return to Illinois with them but he agreed to do so voluntarily. He signed a waiver of extradition, and although defendant was then 25 years of age, the police officers requested that his sister also sign the waiver, and she did so.

Although the police officers testified that defendant was not arrested until approximately 5:00 P.M. the next day, the record shows that defendant returned to Evanston by automobile with the police officers, arriving there at about 1:00 A.M., spent the rest of the night in a hotel room in Evanston under surveillance of two police officers, the next morning accompanied police officers to the office of John Reid & Associates where polygraph tests were administered, and except while closeted with the polygraph examiner was never out of the presence of police officers. It was only after he had admitted to the polygraph examiner that he killed Mrs. Sewell that he was placed under arrest. Following the "arrest," an assistant State's Attorney took a question and answer statement. The statement was transcribed, and after conferring with the Evanston police officers, the assistant State's Attorney took another statement in order to "correct" errors and misstatements made by defendant in the first statement.

The testimony shows that defendant was advised of his rights twice in Pennsylvania, twice while in the office

of Reid & Associates, and four times by the assistant State's Attorney. The polygraph examiner testified that at approximately 10:30 A.M. when he entered the examining room where defendant had been placed, defendant stated that he thought he should have a lawyer. The examiner told him that he would go tell the police officers, and defendant said he didn't need an attorney until the tests were completed. The examiner commenced a "pre-test interview" which was suspended at 11:30 A.M. when two police officers took defendant to lunch. Defendant was returned to the Reid offices at 1:00 P.M. The tests were completed shortly before 3:00 P.M., at approximately 3:00 P.M. the polygraph examiner advised defendant of his *Miranda* rights and after an additional twenty minutes of interrogation he told defendant that the polygraph tests indicated that he had killed Mrs. Sewell. When defendant did not respond, the examiner talked to him further "trying to persuade him to admit that he had been lying." The confessions were signed by defendant approximately 34 hours after he first met the Evanston police officers in McKeesport.

The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequence unless the defendant was possessed of the intelligence to understand the admonition. Although there is no doubt that defendant was advised of his rights as mandated by *Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602,* the question presented by this record is whether he knowingly waived those rights. In *Johnson v. Zerbst, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019,* the Supreme Court said: "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each

case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

This court has long recognized that the mental capacity of a defendant must be taken into consideration in determining whether his actions were voluntary (*People v. Klyczek, 307 Ill. 150, 155*) and while mental deficiency, of itself, does not render a confession involuntary (*People v. Hester, 39 Ill.2d 489*) it is a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession made. See 69 A.L.R.2d 348 and cases there collected; see also *Smallwood v. Warden, Maryland Penitentiary (4th Cir. 1966), 367 F.2d 945; Harvey v. State (Miss. 1968), 207 So. 2d 108; Dover v. State (Miss. 1969), 227 So. 2d 296; People v. Lux (Suffolk County Ct. 1967), 56 Misc. 2d 561; 289 N.Y.S.2d 66; People v. Pounds (Sup. Ct. 1970), 64 Misc. 2d 634, 315 N.Y.S.2d 672.*

The record shows that the police officers knew of defendant's history of mental retardation and, indeed, as previously noted, had asked his sister to sign the waiver of extradition. On the day on which the statements were made defendant was taken to the offices of Reid & Associates at approximately 10:30 A.M. Except for a period of approximately 90 minutes he was with the polygraph examiner until he "confessed" to him, and during that 90 minutes he was in the custody of two police officers. The polygraph examiner testified that at 10:30 A.M. defendant asked "if he could have an attorney." In *Miranda*, the Supreme Court after stating that a defendant could voluntarily, knowingly and intelligently waive his rights said: "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may

have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612.

In *People v. Henenberg, 55 Ill.2d 5, 11,* we quoted with approval from *United States v. Blair, 470 F.2d 331,* the statement that the language of *Miranda* "could hardly have been more uncompromising" that if the accused "indicates in any manner and at any stage of the process that he wishes to speak with an attorney before speaking there can be no questioning," and that if he states that he wants an attorney "the interrogation must cease until an attorney is present." The testimony shows that the polygraph examiner knew that defendant was of low mentality, yet so far as the record indicates he did not advise the police officers of his request for an attorney. It was not until 5 hours later that defendant confessed to the polygraph examiner and an additional 7 hours elapsed before the statements were revised to the satisfaction of the police, and signed by the defendant. We have noted the People's contention that defendant was not arrested until 5:00 P.M. on that day and have searched the record and briefs in vain for their explanation of his status during the preceding 28 hours, during which he was constantly in the presence of at least 2 police officers, or sleeping in a hotel room with 2 police officers outside his door. The record fails to show that the defendant made an intelligent knowing waiver of his rights (*People v. Roy, 49 Ill.2d 113*), shows affirmatively that questioning continued after the defendant told the polygraph examiner, the agent of the police, that he wanted a lawyer and that the inculpatory statements were made subsequent to that time. We hold, therefore, that the motion to suppress should have been allowed. We hold further that the admission of defendant's confessions was not harmless

error beyond a reasonable doubt (*Chapman v. California, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824*) and that the judgment must, therefore, be reversed and the cause remanded for a new trial.

Because this cause is remanded for retrial we consider other alleged errors concerning matters which may recur.

The circuit court allowed the People's motion that defendant be required to permit a blood sample to be taken by a physician, and subsequently denied his motion that the blood sample be suppressed. Relying on *Schmerber v. California, 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826,* defendant contends that the blood sample was taken in violation of his fourth amendment rights. The People argue that under Rule 413(a)(vii) a sample of defendant's blood may now be obtained in a procedure "not very different from that followed in this case." Although the blood sample was taken prior to our adopting Rule 413(a)(vii), the procedure followed provided adequate safeguards of defendant's rights and the court did not err in denying the motion to suppress.

The record shows that defendant tendered and the court refused to give an instruction in the form of IPI Criminal No. 24.01, and defendant contends that the refusal to so instruct the jury was reversible error. The People argue that "While there was ample testimony at trial to establish that appellant was mentally retarded, there was none indicating that as a result of his mental defect he was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." They argue further that a physician, who was asked whether defendant's inability to think in abstract terms affected his ability to "appreciate" or conform his conduct, answered in the negative, and that no other witness was asked to express an opinion as to defendant's sanity.

The Criminal Code of 1961, in pertinent part, provides: "(a) A person is not criminally responsible for

conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1971, ch. 38, par. 6—2(a).) To paraphrase our statement in *People v. Childs, 51 Ill.2d 247,* human experience would support the conclusion that evidence which showed that a man of 25, a moron who had spent ten years in an institution for the mentally retarded from which he then escaped, could not give his address or spell his middle name, was sufficient to raise the question of whether by reason of a "mental disease" or "mental defect" he lacked "substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Upon this record, the refusal to give the tendered instruction was error.

The parties have briefed and argued other issues arising from allegedly erroneous rulings made during the competency hearing and with respect to the sentences imposed. Because the cause is remanded for a new trial we do not further consider the matters raised concerning the incompetency hearing which determined only that he was competent at that time, and does not preclude a hearing on the question of his competency at this time. With respect to the sentences, in the event of conviction the Unified Code of Corrections (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1001—1—1 *et seq.*) will apply, and we need not further consider the sentences imposed under the prior statutory provisions.

For the reasons stated the judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*