THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PERVIS REDMON, Defendant-Appellant.

First District (1st Division)   No. 82—735

Opinion filed September 4, 1984.—Rehearing denied October 10, 1984.

Robert B. Rosen, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Richard B. Levy, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Pervis Redmon was found guilty of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) and attempted armed robbery (Ill. Rev. Stat. 1979, ch. 38, pars. 8—4, 18—2) and was sentenced to 35 years and 15 years respectively, the sentences to run concurrently. On appeal, defendant contends that the trial court erred in refusing to suppress certain alleged oral confessions where the State had failed to satisfy its burden of demonstrating a voluntary, knowing and intelligent waiver of defendant's constitutional rights. We agree.

The record reveals that the victim, Charles Miller, was employed as a newspaper distributor for the Chicago Sun-Times. On October 11, 1980, Miller was shot and killed during a robbery attempt while he was making collections in a building at 2420 South State Street. The victim was found in the building stairwell alive but seriously wounded. Although he survived for a short period of time, the victim never identified his assailants but did state that he was shot during a robbery attempt. A subsequent autopsy and ballistics report revealed that Miller was shot at close range with a .38-caliber revolver. There were no eyewitnesses to the crime.

At approximately 9:30 p.m. on the day following the murder, police officer Joseph Cooley arrested defendant for the murder of Charles Miller based solely on information provided by an unidentified informant. Cooley advised defendant of his *Miranda* rights and transported him to the 21st District police station and, later, to Area One Homicide where he briefly questioned defendant alone for three or four minutes. It was approximately 11:30 p.m. when Officer Cooley left defendant. Over the next 19 hours, defendant was successively interrogated by various individuals on four different occasions, the final time in the presence of a court reporter.

Detective Willie Johnson, from Area One Homicide, was the first

person to formally interview defendant. Detective Johnson testified that on October 13, at approximately 1 a.m., he advised defendant of his constitutional rights from a preprinted form, after which defendant replied that he understood those rights. He then proceeded to interrogate defendant for approximately 30 to 45 minutes, during which time defendant freely admitted that he and an accomplice named "Slow Boy" had attempted to rob Charles Miller while the victim was making his collections at 2420 South State Street. Defendant stated that during the robbery attempt Slow Boy shot Miller during a struggle, after which both he and Slow Boy fled. Redmon further informed Detective Johnson that he subsequently took the gun used by Slow Boy in the robbery and threw it by the railroad tracks at 2400 South Federal. This area was thoroughly searched by the police, but the gun was never recovered. On cross-examination, Detective Johnson stated that he never took any notes during the conversation, that he never called anyone else to witness defendant's confession, and that he never submitted any report regarding his conversation with defendant. He further testified that at the time defendant was arrested, defendant had just turned 17 years of age.

Following Detective Johnson's interview, Detectives Salvatore and Lowrey interrogated defendant a second time later that day at approximately 9:30 a.m. Detective Salvatore testified that before he questioned defendant, his partner, Lowrey, advised defendant of his rights from a standard preprinted form and, after having his rights read to him, defendant stated he understood those rights. Defendant then proceeded to relate substantially the same facts concerning the crime that he had previously given to Detective Johnson. Following this interview of defendant, Detective Salvatore contacted the felony review unit of the Cook County State's Attorney's Office.

Assistant State's Attorney Thomas Gainer testified that he received a telephone call from Detective Salvatore at approximately 11 a.m. on October 13, 1980. Gainer stated that he proceeded to the Area One headquarters and, after advising defendant of his rights, interrogated defendant from 3:30 p.m. to 4:30 p.m. During this interview, defendant repeated the same facts he had previously given to Detectives Johnson and Salvatore.

Shortly after his conversation with Redmon, Gainer summoned a court reporter to take defendant's statement. With the court reporter present, Gainer again read defendant his constitutional rights from a preprinted form, after which the following colloquy occurred:

"Q. Understanding these rights, do you wish to talk to me now?

A. I don't know. I don't really understand.

Q. You don't understand what, the rights?

A. Yeah.

Q. Okay, let me see if I can explain them to you. We talked earlier today, did we not?

A. Yeah.

Q. Today, did we not?

A. Yeah.

Q. This is the first time anybody, all day long, has suggested I am going to explain your rights to you. I am not just going to read them, I am going to explain them."

Gainer then elicited from defendant the fact that defendant had been advised of his rights by him and other police officers and that he had responded that he understood his rights. The assistant State's Attorney then attempted to individually explain each right to defendant. After this explanation, the following conversation ensued:

"[Assistant State's Attorney Gainer]: Q. Tell me what it is about those four paragraphs you don't understand, I will be happy to explain it to you.

A. Number four—I mean number three.

Q. Number three. Number three is the paragraph that says you have the right to talk to a lawyer and have him represent you while you are being questioned.

A. Yes.

Q. Well, that is what we have been telling you all day, isn't it?

A. Yes.

Q. Well, that means, well, what that means is, before anybody talks to you today, you could have asked for a lawyer and he would be present with you while we were talking to you.

A. Yes.

* * *

Q. You are talking about number three, right?

A. Yes, sir. And I understand if I don't want to talk to you, I can get a lawyer.

Q. And that is the way it has been all day, Pervis, and that is what you have been acknowledging, that you understood all day, isn't it?

A. Yes.

Q. So you understood it earlier when you were told that, didn't you?

A. Not quite. I didn't understand because, you know, I

*never been too much arrested and really understand."*
Thereafter, when asked by Assistant State's Attorney Gainer if he wanted to continue the interview, defendant stated he did not and the interrogation ceased. A written waiver of rights was never signed by defendant.

At the hearing on defendant's motion to suppress statements made while in police custody, defendant presented expert testimony on his mental ability. Dr. Rosenwald, a practicing psychologist, testified that he had administered three different standardized tests to defendant which measured such things as ability to reason, questions of judgment, items of information, ability to recognize objects and understanding of certain social situations. Dr. Rosenwald expressed his opinion that defendant had an IQ of 70 or 71 and fell in the category of borderline mental deficiency, scoring in the lower 10% of the general population. Dr. Rosenwald further testified that a prior psychological evaluation of defendant by Dr. Sabatini indicated an IQ of 73 and a reading ability at a 5.2 grade level. Dr. Rosenwald testified that this prior study was supportive of his own conclusions. His findings were also corroborated by defendant's performance on standardized achievement tests administered at defendant's high school in 1979. The results demonstrated that defendant, who was at that time 16 years old, received grade equivalent scores ranging from fourth grade, second month, in mathematical skills to fifth grade in reading.

Dr. Rosenwald expressed his opinion that defendant would not understand his rights if they were merely read to him in rote fashion. He also testified that he did not believe defendant would comprehend the meaning of waiving his rights, stating that

"they [defendant's rights] would have to be enunciated in considerable detail with considerable caution as to what it meant.

Simply reading the rights seems to me that with his general level of intelligence and particular difficulty in reading and writing that he would have grave difficulty in understanding the concept of what his rights were."

At the conclusion of the hearing, the trial court found that defendant understood his rights and denied defendant's motion to suppress all statements made while in police custody.

It is axiomatic that prior to custodial interrogation the subject must be adequately informed of his right to remain silent and to have an attorney present. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) The prophylactic warnings required under *Miranda* contemplate more than a mere ritualistic recital of words meaningless to the accused. Rather, an intelligent conveyance

of the accused's rights is mandated. (*People v. Prim* (1972), 53 Ill. 2d 62, 67, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L.Ed. 2d 144, 93 S. Ct. 2731.) Thus, the crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being questioned, impart a clear, understandable warning of all his rights. *People v. Baker* (1973), 9 Ill. App. 3d 654, 660, 292 N.E.2d 760.

The right to remain silent and to have counsel present can be waived, providing that the waiver is voluntarily, knowingly, and intelligently made. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.) In demonstrating waiver, the burden rests on the prosecution to show a knowing and intelligent relinquishment of a known right or privilege. (*Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880; *People v. Smith* (1982), 93 Ill. 2d 179, 185-86, 442 N.E.2d 1325.) This is a matter which depends, in each case, upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. *People v. Perez* (1983), 113 Ill. App. 3d 143, 147, 446 N.E.2d 1229.

In examining the facts and circumstances surrounding a purported waiver of an individual's constitutional rights, the courts of this State have long recognized the special care which should be exercised when evaluating the confessions of youthful or mentally deficient individuals. (See *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383; *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27; *People v. Baker* (1973), 9 Ill. App. 3d 654, 292 N.E.2d 760.) In *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27, our supreme court reviewed the confessions obtained from a 25-year-old defendant with an IQ of 70.[1] As in the present case, the defendant in *Turner* was advised of his *Miranda* rights on several occasions while in custody. The defendant was sent to a polygraph examiner for an interview and was again advised of his rights by the examiner. In response, the defendant in *Turner* initially stated he thought he should see a lawyer but then decided he would not need an attorney until the tests were completed. After the polygraph examination, the defendant was again advised of his rights and was told the results of the examination indicated he had killed the individual in question. The defendant subsequently signed two confessions which were used against him at trial.

---

[1] IQ was determined by the defendant's performance on the Wechsler Adult Intelligence Scale and placed the defendant in the lower 10% of the general population.

In addressing the State's claim of waiver, the *Turner* court noted:

> "The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequence unless the defendant was possessed of the intelligence to understand the admonition. Although there is no doubt that defendant was advised of his rights as mandated by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the question presented by this record is whether he knowingly waived those rights." (*People v. Turner* (1973), 56 Ill. 2d 201, 205.)

The court further commented on the role a defendant's mental ability has in determining whether there was a knowing, intelligent, and voluntary waiver:

> "This court has long recognized that the mental capacity of a defendant must be taken into consideration in determining whether his actions were voluntary (*People v. Klyczek,* 307 Ill. 150, 155) and while mental deficiency, of itself, does not render a confession involuntary (*People v. Hester,* 39 Ill. 2d 489) it is a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession made. [Citations.]" (56 Ill. 2d 201, 206.)

The court concluded that the defendant had not knowingly and intelligently waived his rights and that the confessions should have been suppressed. 56 Ill. 2d 201, 207.

In *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383, our supreme court examined the confession of a 16-year-old defendant with an IQ of 80.[2] There, the court extensively quoted from *Turner* with approval and further commented on the special care which should be used in scrutinizing statements obtained from a youthful, borderline, mentally retarded individual. Quoting from *In re Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428, the court noted:

> " 'If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S.

---

[2]IQ was determined by the defendant's performance on the Wechsler Adult Intelligence Scale and placed defendant in the bottom 20% of the general population.

Ct. 1428, 1458." (*People v. Simmons* (1975), 60 Ill. 2d 173, 180.)

Our supreme court concluded that the trial court had not exercised the "special care in scrutinizing the record" required in the case of a 16-year-old borderline, mentally deficient boy and remanded the case for reconsideration.[3] *People v. Simmons* (1975), 60 Ill. 2d 173, 181-82; see also *People v. Baker* (1973), 9 Ill. App. 3d 654, 292 N.E.2d 760 (affirming the trial court's decision suppressing a confession obtained from a 15-year-old boy with an IQ of 72).

As the State correctly contends, a trial court's determination on the voluntariness of a confession will not be disturbed unless it is contrary to the manifest weight of the evidence. (*People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181.) However, based on the record before us, we find the trial court erroneously concluded that the State had met its burden of demonstrating a knowing, intelligent and voluntary waiver.

While the State argues at great length that defendant understood his right to remain silent, it systematically avoids any discussion with regard to defendant's understanding of his right to consult with an attorney and to have counsel present during interrogation. Defendant's confusion on his right to counsel is clearly documented in the transcript of defendant's final interrogation by the assistant State's Attorney. As in *Turner*, the fact that defendant was repeatedly read his rights and repeatedly responded that he understood is of little consequence for, here, defendant did not possess the intellectual or verbal skills to comprehend a mere rote reading of his rights. Clearly, none of the interrogating police officers made any attempt to clarify or explain the *Miranda* warnings, apart from reading defendant his rights from a preprinted form. Although defendant's interrogators uniformly testified that defendant was responsive and appeared to understand their questioning, there exists no explanation of record as to why defendant, after fully confessing during his first interview, was subsequently questioned over the next 14 hours two additional times before a court reporter was called to take his statement. It was not until defendant's final interrogation in the presence of the court reporter that Assistant State's Attorney Gainer attempted to explain the *Miranda* rights to defendant in a concrete manner. Gainer's approach

---

[3]On remand, the trial court found the defendant's confession voluntary and a knowing, intelligent waiver based on the presence of the defendant's mother and brother during questioning. This result was later affirmed on appeal. *People v. Simmons* (1978), 58 Ill. App. 3d 1026, 374 N.E.2d 1290.

is instructive. Rather than describing the right to counsel in abstract terms, Gainer advised defendant that before anybody talked to him that day defendant could have asked for a lawyer and the lawyer would have been present during interrogation. In response, defendant explicitly states that he now understands "if I don't want to talk to you, I can get a lawyer" and that he previously did not understand his right to counsel.

We find the record, when viewed with due regard given to defendant's youth, limited mental ability, and obvious confusion concerning his rights, fails to support a finding of a voluntary, knowing and intelligent waiver of defendant's constitutional rights. The trial court's findings to the contrary were against the manifest weight of the evidence and require reversal on our part. Accordingly, we hold that defendant's motion to suppress should have been allowed. The judgment of the trial court is, therefore, reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

McGLOON and GOLDBERG, JJ., concur.