THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. BRIAN BERNASCO, Defendant-Appellee.

Fifth District No. 5—87—0344

Opinion filed June 27, 1989.

482

Dick Allen, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Matthew E. Franklin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

William C. Evers III, of Collinsville, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

This is an appeal by the State from an order of the trial court suppressing the confession of the defendant, Brian Bernasco, as involuntary. On December 30, 1986, the juvenile officer of the Collinsville police department told the defendant's father that he wanted to talk to the defendant at the station. When the defendant and his father arrived at the police station the juvenile officer told them that a detective would do the questioning. According to the testimony of the defendant's father, Detective Zukosky appeared and stated: "You can come in now." The defendant's father said that he then got up to go in with the defendant, but was told by the detective, "[N]o, you sit and wait here." Detective Zukosky, however, testified that he did not recall the father wanting to accompany the defendant nor did he tell the father that he could not do so.

Detective Zukosky took the defendant to the detective's office located in the basement of the Collinsville police station. The defendant, who was 17 years old and had never been arrested or interrogated by the police, testified that he was scared when he was taken downstairs. Officer Borkowski joined the defendant and Detective Zukosky in the detective's office. The door to the office was left open. The defendant was given a copy of his *Miranda* rights and Officer

Borkowski testified that he read each section to the defendant, who then initialled each section. The defendant was asked if he had any questions about his rights, and if he understood them, and he acknowledged that he did understand them. The defendant then signed a waiver of rights form which was witnessed by Officer Borkowski and Detective Zukosky.

Officer Borkowski then read the defendant his rights as printed on the "voluntary statement forms" used to take the defendant's statement. The defendant then gave an oral statement in which he admitted his involvement in several burglaries, and Officer Borkowski reduced the statement to writing at the defendant's request. The defendant was then given the statement to read, and Detective Zukosky testified that he read it aloud. The defendant then initialled the scratch mark that Borkowski had made and signed the voluntary statement. Detective Zukosky testified that there was nothing in the defendant's demeanor or his answers to questions that would indicate that he did not understand what his rights were. He stated that the defendant did not seem to have any trouble grasping the questions he was asked, and that he answered in a normal manner, giving logical answers. No threats or promises were made to the defendant and he did not appear to be intoxicated or under the influence of any drugs.

On cross-examination, Detective Zukosky testified that he did not know if the defendant was in school or what level of education the defendant had attained. Zukosky also agreed that he did not know anything about the defendant's reading ability, comprehension ability, or IQ. Detective Zukosky also stated that he did not know if someone with a fourth-grade reading and comprehension level could understand legal terms. Officer Borkowski similarly acknowledged that he was not familiar with the defendant's academic credentials or his reading ability.

Don Mattingly, a school psychologist employed by the Parando Special Education District in Red Bud, testified for the defendant at the suppression hearing. Mattingly has a bachelor's and a master's degree in psychology from Eastern Illinois University and has spent the last 12 years working as a school psychologist. Mattingly evaluated the defendant in March of 1986, approximately nine months prior to the defendant's interrogation, to determine whether he was qualified for special education services. After evaluating the defendant, who was attending regular classes at the time, Mattingly concluded that the defendant did not qualify for the Collinsville special education programs. Mattingly also concluded that the defendant had a full scale IQ of 80, and he stated that the 80 to 89 range is referred to as the slow

learner or low average range. Mattingly also determined that the defendant's reading skills were at the beginning to middle fourth-grade level.

The psychologist testified that when the two police officers interviewed the defendant in the police station, the defendant would have found the circumstances intimidating. On cross-examination, however, Mattingly also indicated that anyone, regardless of educational background, who was being interrogated by two police officers would find the circumstances intimidating. In such a situation, Mattingly stated that the defendant would probably agree "to most everything that was said to him to get himself out of the situation."

Mattingly further stated that in his opinion defendant did not have the ability to understand legal terms. He agreed that it was unlikely that the defendant could understand words like "interrogate," "court-appointed attorney," "intimidation," "immunity," or "waiver." He also testified, however, that the defendant probably had an idea what a lawyer is, and would likely understand the phrases "I do not have to talk with any Collinsville police officer, unless I want to" and "I know I can refuse to answer any questions."

The defendant's father, Carl Bernasco, testified that the defendant dropped out of school in the ninth grade and had never before been arrested or interrogated by the police. Mr. Bernasco testified that the only reason he did not go with his son when he was being questioned by the police was because Detective Zukosky told him that he could not.

The defendant, Brian Bernasco, also testified at the suppression hearing. He stated that the officer handed him a copy of the *Miranda* waiver and read it to the defendant at a normal pace. The defendant admitted that he initialled and signed the waiver of rights forms, but stated that he was not paying attention, was scared, and did not understand what the waiver meant. The defendant also denied that the officer asked him if he understood his rights after each section of the *Miranda* waiver was read to him. Instead, the defendant stated that the officer told him to initial each paragraph, and then when he finished reading the entire document, he was asked if he understood his rights. The defendant admitted that he told the officer that he understood his rights when he was asked.

The defendant also admitted initialing the *Miranda* rights waiver at the top of the voluntary statement form but denied that Detective Zukosky readvised him of his rights. After signing the waiver forms, the defendant was asked to tell everything he knew. The defendant gave his statement and Detective Zukosky wrote it down. The defend-

ant admitted that the information contained in the written statement came from him and that he read it over, but stated that he did not read it out loud. The defendant admitted signing the voluntary statement forms, but said that he did not understand at the time of the questioning that he had a right to refuse to speak to the police and had a right to leave when he wanted.

The court found that the defendant did not knowingly and voluntarily waive his right to remain silent. The court stated that it did not find that the Collinsville police department did anything inappropriate or threatened or harassed the defendant in any way. The court nevertheless suppressed the defendant's statement because:

"Based upon the *Berry* case [*People v. Berry* (1984), 123 Ill. App. 3d 1042, 463 N.E.2d 1044] I do not believe that this Defendant, who had no prior criminal experience and who reads at a beginning fourth-grade level and who, more importantly, comprehends at a fourth-grade level, could affectively [*sic*] under those circumstances, without the aid of his parents or someone who would assist him in translating what was really happening, I don't believe he voluntarily waived his rights, even though there is no question that he did sign the Wavier of Rights Form, and there is no question that he did so without being forced to do so by anyone."

In its written order the court, after finding that the defendant had an IQ of 80, a fourth-grade reading and comprehension level, and no prior criminal experience, further found:

"4. That the Statement, which is sought to be suppressed, was written totally by the police officer, who was doing the interrogating and only signed by the Defendant, Brian Bernasco.

5. That the police officers in this case, namely Detectives Zukosky and Borkowski, were of the opinion that the Defendant, Brian Bernasco, understood his constitutional rights prior to giving a Statement in this case. Further, the police officers, quite properly, had Brian Bernasco initial his *Miranda* Waiver Form and to sign it with them witnessing it. Further, the police officers did not inquire into Brian's background and, instead, relied solely upon him indicating that he understood his 'rights.'

6. That the school psychologist, who had personally tested Brian Bernasco, testified in the case and testified that there were numerous words contained in the *Miranda* Waiver, which Brian in his opinion would be incapable of understanding because of his limited comprehension and reading skills. The psy-

chologist further testified that his ability to understand those words, while limited, could be enhanced by someone explaining them to him, but the testimony of the police officers clearly indicated that no one explained what the terminology within the *Miranda* Waiver meant.

7. That the Father of Brian Bernasco took Brian to the police station and requested an opportunity to be with Brian during the interrogation, and that opportunity was refused.

8. That the direct testimony of Brian Bernasco indicated to the Court, in its observations of the Defendant, that the Defendant had substantial difficulty in understanding relatively routine questions. The Court further observed, from the testimony of Brian Bernasco, that the Defendant was not only limited in his comprehension of single words but, further, was substantially unable to understand relatively simple concepts. That it is the Court's opinion that Brian Bernasco was barely a 17 year old adolescent with sub-normal intelligence, with little education, dependent fully upon his parents, and lacking in experience in criminal affairs completely.

9. That the Court, when confronted with such a situation, feels that it is the obligation of the Court to make sure that the greatest of care was taken to assure that the Confession was voluntary and, further, that the Confession was not a product of ignorance of rights or of adolescent fantasy, fright or despair. (*In re Gault* and *People v. Simmons*).

10. That the Court is not suggesting in these findings that the Collinsville Detectives, in any way, overreached or threatened or coerced the Defendant into giving his Statement in this case; rather, the Court feels that the facts indicate, clearly, that the Confession was not voluntary; and that the Confession was the product of Brian's sub-normal intelligence, his inability to comprehend what his rights were, and his fright of the situation.

11. That the Court is convinced from the testimony of the psychologist, who had no vested interest in this case, whatsoever, that Brian Bernasco would have agreed to and signed most anything placed in front of him during the interrogation process.''

The State now appeals, arguing that: (1) since the trial court found that the Collinsville police officers did not coerce the defendant's confession, the confession is admissible against the defendant; (2) the court's decision was against the manifest weight of the evi-

dence; and (3) the court applied the wrong standard to determine whether the defendant's confession was voluntary.

██ █ The State initially contends that absent a finding that the police engaged in some coercive activity, the confession must be deemed voluntary, citing *Colorado v. Connelly* (1986), 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515. In *Connelly*, a defendant told a Denver police officer that he had murdered someone and wanted to talk about it. Both that officer and a detective who arrived shortly thereafter advised the defendant of his *Miranda* rights. The defendant was then taken to police headquarters where he detailed his story to the police and subsequently pointed out the location of the murder. The next day the defendant became visibly disoriented and was sent to a State hospital for evaluation. At a subsequent suppression hearing, a psychiatrist testified that the defendant was suffering from chronic schizophrenia and was in a psychotic state on the day he confessed. The psychiatrist further testified that the defendant was experiencing "command hallucinations" which interfered with his ability to make free and rational choices. The psychiatrist also testified that Connelly's illness did not significantly impair his cognitive abilities, and thus he understood his rights when the police advised him that he need not speak to them. *Connelly*, 479 U.S. at 160-61, 93 L. Ed. 2d at 480, 107 S. Ct. at 518-19.

On the basis of this evidence the Colorado trial court decided that the defendant's statements must be suppressed because they were "involuntary." The court ruled that a confession is admissible only if it is the product of the defendant's rational intellect and free will. Although the court found that the police had not engaged in any coercive activity, Connelly's illness destroyed his volition and compelled him to confess. The trial court also found that Connelly's mental state vitiated his attempted waiver of the right to counsel and the privilege against compulsory self-incrimination. The Colorado Supreme Court affirmed the trial court, finding that the defendant's initial statement was not the product of a rational intellect and a free will, and noting that the absence of police coercion does not foreclose a finding of involuntariness. The court then considered the defendant's attempted waiver of his constitutional rights and found that his mental condition precluded his ability to make a valid waiver. *Connelly*, 479 U.S. at 161-62, 93 L. Ed. 2d at 481, 107 S. Ct. at 519.

The United States Supreme Court reversed, finding that coercive police activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the due process clause. While the mental condition of a defendant may be a significant factor in de-

termining the voluntariness of a confession, it does not "by itself \*\*\* dispose of the inquiry into constitutional 'voluntariness.' " (*Connelly*, 479 U.S. at 164, 93 L. Ed. 2d at 482, 107 S. Ct. at 520.) "Only if we were to establish a brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated—could respondent's present claim be sustained." *Connelly*, 479 U.S. at 166, 93 L. Ed. 2d at 484, 107 S. Ct. at 521.

The Supreme Court also found that the supreme court of Colorado was mistaken in its analysis of the question of whether the defendant had waived his *Miranda* rights. The Colorado court relied on the testimony of the psychiatrist to the effect that the defendant was not capable of making a free decision with respect to his constitutional right of silence and his constitutional right to confer with a lawyer before talking to the police. The Supreme Court stated that the Colorado court "erred in importing into this area of constitutional law notions of 'free will' that have no place there. There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context." (*Connelly*, 479 U.S. at 169-70, 93 L. Ed. 2d at 486, 107 S. Ct. at 523.) The voluntariness of a waiver of the fifth amendment privilege "has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." (*Connelly*, 479 U.S. at 170, 93 L. Ed. 2d at 486, 107 S. Ct at 523.) *Miranda*, stated the Court, "protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Connelly*, 479 U.S. at 170, 93 L. Ed. 2d at 487, 107 S. Ct. at 524.

The defendant, relying on the following language, argues that *Connelly* does not stand for the proposition that absent police coercion any confession is voluntary.

> "We conclude that the admissibility of this kind of statement is governed by state rules of evidence, rather than by our previous decisions regarding coerced confessions and *Miranda* waivers." *Connelly*, 479 U.S. at 159, 93 L. Ed. 2d at 479, 107 S. Ct. at 518.

> "We think the Constitution rightly leaves this sort of inquiry [into a criminal defendant's state of mind] to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area. A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary

laws of the forum *** and not by the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167, 93 L. Ed. 2d at 484, 107 S. Ct. at 522.

Based on the above language, the defendant argues that the States are free to develop their own "voluntariness" standards and therefore the trial court correctly relied on *People v. Berry* (1984), 123 Ill. App. 3d 1042, 463 N.E.2d 1044, in suppressing his confession. The defendant's argument is unpersuasive for two reasons.

First, while it is true that the defendant in *Berry*, who was 17 years old, had an IQ of 80, limited ability to read, write and comprehend, and no prior criminal record, bears a remarkable resemblance to the defendant in the instant case, the *Berry* court did not find those factors to be determinative. The *Berry* court correctly recognized that the test to determine whether a confession is voluntary is whether the defendant's will was overborn at the time of the confession. (*Berry*, 123 Ill. App. 3d at 1044, 463 N.E.2d at 1047, citing *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508.) The court further recognized that the general rule is that subnormal mentality does not in itself make a confession involuntary as long as the defendant has the capacity to understand the meaning and effect of the confession. (*Berry*, 123 Ill. App. 3d at 1045, 463 N.E.2d at 1047.) The court found that the defendant's subnormal mentality, coupled with his young age, lack of education, and complete lack of experience in criminal matters, suggested an increased susceptibility to coercion and intimidation. The court then examined the conduct of the police in obtaining the confession and held it to be involuntary in "light of the intimidating, coercive and deceptive atmosphere of the interrogation." (*Berry*, 123 Ill. App. 3d at 1045, 463 N.E.2d at 1048.) The activities which the court found to be deceptive and coercive included isolating the defendant from his mother, closing the door to the interrogation room and stationing an officer outside, interrogating the defendant about an unrelated offense concerning an acquaintance, and intimating that the defendant's fingerprints might have been found at the scene of the crime. Moreover, the police officer who questioned the defendant admitted that he knew of the defendant's impairment of mind, that he did not give him any *Miranda* warnings because he wanted to obtain a confession, and that he told the defendant he was not under arrest in order to avoid *Miranda*. In the instant case, on the other hand, the court explicitly found that the police had not engaged in any type of coercive activity.

Second, the statement by the Supreme Court in *Connelly* that "the Constitution rightly leaves this sort of inquiry [into the state of

mind of a criminal defendant who has confessed] to be resolved by state laws governing the admission of evidence and erects no standard of its own" (*Connelly*, 479 U.S. at 167, 93 L. Ed. 2d at 484, 107 S. Ct. at 522) is not an invitation to State courts to individually define the scope of the protection afforded by the fourteenth amendment. It is merely an acknowledgment that, while in the absence of police coercion the due process clause does not require a confession to be suppressed, the evidentiary rules of a State concerning such matters as the defendant's competency may affect the admissibility of the confession. Based on the above, it is clear that the defendant's confession was "voluntary" within the meaning of the due process clause.

 We note with approval, however, that some commentators critical of *Connelly* have urged that State courts, when called upon to apply the provisions of their own constitutions, should not adhere to the Supreme Court's expansive interpretation of voluntariness. (See, *e.g.*, Garcia, *Mental Sanity & Confessions: The Supreme Court's New Version of the Old "Voluntariness" Standard*, 21 Akron L. Rev. 275, 285 (1988) (After *Connelly*, State law is the "last bastion of protection for mentally ill defendants"); Note, *Confessions Compelled by Mental Illness: What's an Insane Person to Do?*, 56 Cin. L. Rev. 1049, 1072 (1988) (*Connelly* "once again places the burden on the states to uphold individual rights").) While our supreme court has recently indicated an increased willingness to construe provisions of the Illinois Constitution differently than similar provisions in the Federal Constitution (see, *e.g.*, *People ex rel. Daley v. Joyce* (1988), 126 Ill. 2d 209, 533 N.E.2d 873), we need not decide whether our constitution provides broader protection than the Federal Constitution to criminal defendants such as Connelly. We do not base our decision on *Connelly*, which held that police coercion is necessary to render a statement involuntary. Rather, we affirm the suppression of the defendant's confession based on the trial court's finding that the defendant did not knowingly and intelligently waive his fifth amendment rights.

The trial court, in addition to finding the defendant's confession was involuntary, also found that the defendant had not voluntarily waived his fifth amendment *Miranda* rights. The *Miranda* warnings are required, however, only when a defendant is in custody "or otherwise deprived of his freedom of action in any significant way." (*People v. Wipfler* (1977), 68 Ill. 2d 158, 168, 368 N.E.2d 870, 874, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) We must therefore determine, as a preliminary matter, whether the defendant's statement in the instant case was the result of a custodial interrogation.

 The test used to determine whether a statement was made in a custodial setting is whether a reasonable, innocent person would have believed that he was free to leave or was expressly or impliedly bound to remain in the presence of the police. (*People v. Finklea* (1983), 119 Ill. App. 3d 448, 452, 456 N.E.2d 680, 682; *People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226, 230.) The court must look to all the circumstances surrounding the questioning, with no single factor deemed controlling. The factors to be considered include: (1) the location, time, length, and mood and motive of the interrogation, including the extent of the knowledge possessed by police; (2) the number of police officers present and the presence or absence of friends or family of the accused; (3) any indicia of formal arrest, including physical restraint, show of weapons or force, booking, fingerprinting, or informing the person he is under arrest; (4) whether the accused arrived at the place of interrogation voluntarily on his own, in response to a police request, or on a verbal command indicating compulsion; (5) whether the accused voluntarily assists police in their investigation; (6) whether the subject is allowed to walk within and from the location of the interrogation unaccompanied by police; and (7) the age, intelligence, and mental make-up of the subject. (*Finklea*, 119 Ill. App. 3d at 452, 456 N.E.2d at 682; *Savory*, 105 Ill. App. 3d at 1028, 435 N.E.2d at 230.) In the instant case we note that the defendant, who was 17 years old, of below normal intelligence, and inexperienced in dealing with the police, was brought to the police station by his father at police request. The defendant was then taken to an office in the basement of the Collinsville police department where, isolated from his father, he was questioned by two experienced detectives. We particularly note that the defendant's father was not allowed to accompany the defendant, but was instead told to remain upstairs. While this factor is not determinative, we believe that it would reasonably suggest to the defendant that he was no longer free to do as he might choose, but was instead subject to the control and commands of the police. (See Smith, *The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?*, 25 S.C.L. Rev. 699, 732 (1974) (Arguing that a person requested to come to the police station "is subject to the same coercive atmosphere and tactics as the person placed under arrest" and that an "ignorant defendant may see the police request as an order which he cannot refuse, and thus be in custody as effectively as if he were handcuffed").) As Justice Goldenhersh pointed out in his dissent in *People v. Wipfler* (1977), 68 Ill. 2d 158, 175-76, 368 N.E.2d 870, 877 (Goldenhersh, J., dissenting, joined by Dooley, J.):

"The constitutional rights which *Miranda* was designed to protect are so important that their effective exercise should not depend on the type of judicial hairsplitting present in this and similar cases. The record shows that this 18-year-old defendant was taken to the sergeant's office in the police station, that Detective Kuntz sat at one desk, Detective Mahoney sat at the other, the defendant sat across the desk from Mahoney, and the door to the office was closed. It would be remarkable indeed if under those circumstances an 18-year-old high school student reached any conclusion other than he was in custody and that any attempt to leave would be unsuccessful. Assuming, *arguendo*, that the defendant's belief that he was not free to leave during the questioning was not 'objectively reasonable,' '[i]t has been noted that as a logical matter, a person who honestly but unreasonably believes he is in custody is subject to the same coercive pressures as one whose belief is reasonable; this suggests that such persons also are entitled to warnings. See, *e.g.*, LaFave, "Street Encounters" and the Constitution, 68 Mich. L. Rev. 39, 105 (1968); Smith, The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation, 25 S.C.L. Rev. 699, 711-714 (1974).' *Oregon v. Mathiason*, 429 U.S. 492, 496 n.1, 50 L. Ed. 2d 714, 720 n.1, 97 S. Ct. 711, 714-15 n.1 (Marshall, J., dissenting)."

Although it is a close question, we believe that a reasonable, innocent person would have believed that he was not free to leave. (See *People v. Hagar* (1987), 160 Ill. App. 3d 370, 513 N.E.2d 628 (defendant was questioned in custodial setting where he was brought to office of DCFS investigator by parents and questioned behind closed doors); *People v. Clark* (1980), 84 Ill. App. 3d 637, 405 N.E.2d 1192 (defendant was in custodial situation where friend who had been sitting in squad car with defendant was asked to leave after defendant stated she had shot her husband).) Having concluded that the questioning of defendant occurred in a custodial setting, we now examine the trial court's finding that the defendant's waiver of his *Miranda* rights was invalid.

■ The trial court found that the defendant had not "voluntarily waived his rights". As explained in *Connelly*, however, police coercion is a necessary predicate of such a finding. Since no such coercion was found here, we are compelled to hold that the defendant's waiver of his *Miranda* rights was voluntary within the meaning of the fifth amendment. An analysis of the validity of a waiver of the defendant's fifth amendment rights, however, does not cease upon a finding of

voluntariness.

■ As Justice Brennan pointed out in his dissent in *Connelly*, there is a second requirement, apart from the voluntariness requirement, that the State must satisfy to establish a waiver of *Miranda* rights. Besides being voluntary, the waiver must be knowing and intelligent. (*Connelly*, 479 U.S. at 187-88, 93 L. Ed. 2d at 498, 107 S. Ct. at 533 (Brennan, J., dissenting, joined by Marshall, J.).) To be knowing and intelligent, "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran v. Burbine* (1986), 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141.) Only if the totality of the circumstances "reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Moran*, 475 U.S. at 421, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141.) The Illinois Supreme Court has similarly held that a defendant's purported waiver of his *Miranda* rights is ineffective unless it is knowingly and intelligently made. (*People v. Smith* (1982), 93 Ill. 2d 179, 185-89, 442 N.E.2d 1325, 1328-29 (no knowing and intelligent waiver of right to counsel during interrogation where police interfered with attorney's effort to consult with defendant); *People v. Turner* (1973), 56 Ill. 2d 201, 205-07, 306 N.E.2d 27, 30-31 (defendant who had history of mental retardation known to police and polygraph operator had not made knowing and intelligent waiver of *Miranda* rights).) As Justice Simon has explained:

> "The distinction between an intellect that is rational and a will that is free must not be blurred. It is possible to have one without the other, but both are necessary for a statement to be voluntary. For example, one operating under insane delusions, as in *Blackburn v. Alabama*, may freely choose, without any external compulsion, to confess participation in a crime in great detail. The defendant may seem to give 'sensible' answers to questioning. But the mental disease afflicting the defendant robs the defendant of any rational choice. Although there is volition, it cannot be said that there is any 'meaningful volition.' Thus, the confession must be suppressed. (*Blackburn v. Alabama* (1960), 361 U.S. 199, 211, 4 L. Ed. 2d 242, 250, 80 S. Ct. 274, 282.) On the other hand, a defendant being tortured on the rack or under more modern third-degree methods may be perfectly rational, concise and consistent in confessing. It is even readily believable that a defendant would try to hedge a confession under such pressures, in order to say as little damning as

possible while avoiding harsher physical or psychological pain. (See *e.g., Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408.) But a rational confession of that type lacks free will. It too must be suppressed." *People v. Kincaid* (1981), 87 Ill. 2d 107, 127-28, 429 N.E.2d 508, 517 (Simon, J., dissenting).

In the instant case the court found, based on its observations of the defendant, that the defendant had substantial difficulty in understanding relatively routine questions, and that the defendant was not only limited in his comprehension of single words, but was substantially unable to understand relatively simple concepts. The court also found that the defendant's confession was the product of his subnormal intelligence, his inability to comprehend what his rights were, and his fright of the situation. Furthermore, the court stated that it was convinced from the testimony of the psychologist that the defendant would have agreed to and signed most anything placed in front of him during the interrogation process. We believe that the trial court's findings, if supported by the evidence, are sufficient to conclude that the defendant did not knowingly waive his *Miranda* rights. We therefore consider the State's second argument.

■■ ■ The State next contends that the trial court's decision was against the manifest weight of the evidence. We will not needlessly lengthen this opinion by again repeating the testimony of the witnesses at the suppression hearing. Suffice it to say that the testimony of the psychologist that the defendant was not capable of understanding certain terms of the *Miranda* rights, and the defendant's own testimony that he did not understand his rights, coupled with the defendant's age, minimal educational level, and lack of experience in criminal matters, are sufficient to support the trial court's decision. The trial court, which had the opportunity to observe the defendant during his testimony, clearly was in a position superior to a court of review to determine the defendant's mental abilities.

We are aware, of course, that evidence of limited intellectual capacity, standing alone, does not indicate that a defendant is incapable of waiving his constitutional rights, (*People v. Murphy* (1978), 72 Ill. 2d 421, 437, 381 N.E.2d 677, 685) nor are the police required, as a prerequisite to accepting a waiver, to conduct a mental examination of the accused to ascertain his ability to comprehend his rights. (*People v. Cooper* (1975), 30 Ill. App. 3d 326, 332, 332 N.E.2d 453, 458, *cert. denied* (1976), 425 U.S. 994, 48 L. Ed. 2d 818, 96 S. Ct. 2206.) Mental deficiency is, however, an important factor in considering the totality of the circumstances under which a purported waiver of rights was

made since the "purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequence unless the defendant was possessed of the intelligence to understand the admonition." *People v. Turner* (1973), 56 Ill. 2d 201, 205, 306 N.E.2d 27, 30.

In support of its position, the State cites numerous cases where a defendant's confession has been held to be admissible despite the defendant's low mental capabilities. (*E.g., People v. Madden* (1986), 148 Ill. App. 3d 988, 501 N.E.2d 1297 (defendant had an IQ of 82 and was under the influence of drugs); *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 501 N.E.2d 207 (defendant had an IQ of 75 and dropped out of school after the eighth grade); *People v. Ellison* (1984), 126 Ill. App. 3d 95, 466 N.E.2d 1024 (defendant had an IQ of 77, was borderline mentally retarded, and had a verbal language disability); *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466 (defendant was 14, had an IQ of 82 and a mental age of nine years, nine months), *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408; *People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675 (defendant was 16, had a IQ of 58, and was mildly retarded and passive dependent), *cert. denied* (1986), 476 U.S. 1106, 90 L. Ed. 2d 361, 106 S. Ct. 1952.) These decisions can offer little support for the State's position, however, since the validity of a waiver of rights is essentially a question of fact. "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (*People v. Turner* (1973), 56 Ill. 2d 201, 205-06, 306 N.E.2d 27, 30, quoting *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023; see also *People v. Redmon* (1984), 127 Ill. App. 3d 342, 347, 468 N.E.2d 1310, 1314; *People v. Perez* (1983), 113 Ill. App. 3d 143, 147, 446 N.E.2d 1229, 1233.) The court in the instant case, after considering all of the evidence and testimony presented, concluded that the defendant's confession was the product of his "sub-normal intelligence, his inability to comprehend what his rights were, and his fright of the situation." Such a conclusion was not contrary to the manifest weight of the evidence.

■ The State's final contention is that the trial court erred by applying the incorrect standard in determining whether the defendant's confession should be suppressed. In its written order, the court found that the defendant "was barely a 17 year old adolescent with

sub-normal intelligence, with little education, dependent fully upon his parents, and lacking in experience in criminal affairs completely." The court went on to state:

> "When confronted with such a situation, [the court] feels that it is the obligation of the court to make sure that the greatest of care was taken to assure that the Confession was voluntary and, further, that the Confession was not a product of ignorance of rights or of adolescent fantasy, fright or despair. (*In re Gault* and *People v. Simmons*)."

Based on the above language, and on the trial court's citation to *Gault* and *Simmons*, both cases involving juvenile defendants, the State argues that the trial court incorrectly applied the "juvenile standard" to this adult defendant. The State contends that the references to "the greatest of care" and to "adolescent fantasy, fright or despair" are only applicable to juveniles and the court therefore erred in basing its suppression of the defendant's confession on adolescent fright or on any "particularly great scrutiny."

The State seeks, in effect, to have this court remand this case to the trial court for a new suppression hearing with directions that the court use less care and be less rigorous in its scrutiny of the defendant's ability to understand and knowingly waive his constitutional rights. We flatly reject such a suggestion. The trial court found that the defendant was unable to comprehend his rights. We fail to see how applying a different "standard" would change that determination. We hold, therefore, that any error which the trial court may have committed in this regard was harmless.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

HOWERTON and GOLDENHERSH, JJ., concur.