THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK URIOSTE, Defendant-Appellant.

Fifth District   No. 5—88—0591

Opinion filed October 11, 1990.

Joseph R. Brown, Jr., of Lucco & Brown Law Offices, of Edwardsville, for appellant.

William Haine, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Following a bench trial in the circuit court of Madison County, defendant, Mark Urioste, was found guilty but mentally ill of murder, home invasion, armed violence, and attempted aggravated criminal sexual assault. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(3), 12—11(a)(1), 33A—2, 8—4(a), 12—14(a)(1).) Defendant was sentenced to concurrent terms of imprisonment of 40 years for murder, 20 years each for home invasion and armed violence, and 10 years for attempted aggravated

criminal sexual assault. From these convictions and sentences defendant appeals.

The following issues are presented for review: (1) whether defendant was proven guilty of the offenses beyond a reasonable doubt; (2) whether defendant was proven sane beyond a reasonable doubt; (3) whether the not guilty by reason of insanity/guilty but mentally ill statutory schemes are reconcilable in defendant's case; (4) whether the trial court erred in admitting certain statements made by defendant; and (5) whether the trial court erred in sentencing defendant to a 40-year term of imprisonment for murder. We affirm.

■ Defendant contends that the evidence presented at trial was not sufficient to prove his guilt of the offenses beyond a reasonable doubt. When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Rather, upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The relevant question then becomes whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (106 Ill. 2d at 261, 478 N.E.2d at 277.) In view of these principles, we conclude that there is ample evidence to support the verdict.

The following evidence, *inter alia*, was presented to the trial court as fact finder. Joyce Rodgers testified that on August 8, 1986, she was living in Madison, Illinois, with her daughters Renee, age 16, and Rebecca, age 20, and Rebecca's two-year-old son. Early that morning Mrs. Rodgers was awakened by a falling sound on the second floor of her home. When she went upstairs, Rebecca's son came running to Mrs. Rodgers at the bedroom door. She set him behind her on the steps and looked into the room, which was lit from outside streetlights. Mrs. Rodgers saw defendant, whom she had known his entire life, on top of her daughter attempting to have sex with her. She told him to get off of Rebecca, which he did, coming towards Mrs. Rodgers with a knife until they were face to face. Mrs. Rodgers stated that defendant had blood on his hands and arms and that he was pulling his pants up as he got off the floor and approached her. Defendant said, "Let me out the front door, Mom," the name he had called Mrs. Rodgers as a youth. Mrs. Rodgers stepped into the bedroom with her grandson, allowing defendant down the front stairs.

Although defendant stumbled on the last four stairs, he had no difficulty in opening the deadbolt lock in order to leave through the front door. Mrs. Rodgers stated that she had previously had problems with

defendant coming into her yard, bothering her daughters, masturbating in front of the window, and walking into her home uninvited, "like he was lost."

Renee Rodgers testified that she was awakened by a noise in the house during the early morning hours of August 8, 1986. Ms. Rodgers stated that her bedroom was in the front of the house near the hallway and that she saw someone who looked like defendant fall down the stairs and run toward the door. Defendant had been in the Rodgers' home a year or two earlier when Renee's bedroom was upstairs. Ms. Rodgers testified that, several days earlier, she had seen defendant attempting to crawl through her bedroom window. She ran from the house and asked her neighbor, Kenneth Click, for help. After that, a lock was placed on her window.

Click, who had known defendant for approximately eight years, testified that Renee Rodgers had summoned him to her home a day or two before the stabbing because defendant was in the house. Click went through the Rodgers' residence and saw defendant in their back yard. When Click asked defendant what he was doing, defendant at first gave no reply and then said that he was going home. About 15 to 20 minutes later, Click saw defendant attempting to climb into the Rodgers' house through Renee's bedroom window. Click grabbed defendant and again asked him what he was doing. Defendant responded that he needed to use the restroom. Click advised defendant to go home and use his own restroom.

Officer Steve Skoklo of the Madison police department stated that he was dispatched to the Rodgers' residence, arriving at approximately 3:52 a.m. on August 8, 1986. Skoklo and Officer Mooshegian were informed by Joyce Rodgers that her daughter had been stabbed. Skoklo testified that upon proceeding to the upstairs bedroom they discovered the victim lying on the floor in a pool of blood, her panties down around her knees. Skoklo later examined the premises for signs of forced entry and discovered that the screen had been pulled away from the bottom of the bathroom window. A bottle of baby powder found outside the bathroom window was identified by Mrs. Rodgers as having been inside the residence on the window ledge.

Robert Allen Hollenbeck, an emergency medical technician (EMT)-firefighter for the City of Madison, stated that he arrived at the Rodgers' residence approximately 3:55 a.m. with EMT-firefighter Rick Robbins and firefighter Donald Whitecotton. The three found a stab wound in the center of the victim's chest that had caused profuse bleeding. Her panties were down between her thighs and her knees. Robbins found a very faint, weak pulse. A second stab wound, in the victim's

back, was discovered upon examination at the hospital.

Deputy Gary Marsala of the Madison County sheriff's department arrived at defendant's residence in the early morning hours of August 8, 1986. Defendant's father, Felix Urioste, admitted Marsala and upon his request led Marsala to defendant's room. Marsala turned on the lights and told defendant, who was lying in bed with the sheet pulled up to his chin, that a young lady had been stabbed and that defendant was accused. Marsala read defendant his *Miranda* rights, and defendant indicated that he understood the rights but stated that he didn't do anything, that he did not know anything about the incident. Marsala noticed that defendant had what appeared to be fresh blood around his neck and on his hands. Upon confronting defendant with this fact, defendant reopened a closed cut on his thumb and began to smear his own blood onto his chest. Marsala told defendant that it was "a little late for that." Marsala, who had known the defendant for over 15 years, stated that defendant was very cooperative and did not appear disturbed or incoherent.

Around 8 p.m. that evening, Deputy Marsala transported defendant from the Madison city jail to the county jail. En route, they passed Officer Mooshegian and defendant said, "He's a cop and I'm a killer," and began talking about the incident. Defendant said that he was sorry for what had happened, that he wasn't there to "get" the victim but was there for Renee and that the two must have switched rooms during the night. Defendant told Marsala that the victim had resisted him saying, "Go ahead stab me, go ahead, make my day." "So I made her day," defendant replied in a laughing tone. Defendant also said he was sorry that the victim's child would be without a mother and that if he won his lawsuit he would give the child a sum of money each month until the child reached 18 years of age. Marsala testified, "[defendant] was carrying on about why he had done it and what events in his life had lead him up to it, and he went into this spiel about drugs, sex and rock 'n roll, and then he said that *** he could live without the drugs or the sex but he couldn't give up rock 'n roll." Although Marsala characterized these last statements made by defendant as "bizarre," he stated that defendant was serious when he made them.

Marsala testified that he told defendant his *Miranda* rights while transporting him. However, no mention of this was made in Marsala's report, and he acknowledged that this failure was an oversight. Marsala denied coercing defendant and said that the defendant was "rambling," but recognized Marsala and was cooperative.

Deputy Mike Staicoff of the Madison County sheriff's department testified that he accompanied Deputy Marsala to the Urioste residence

that morning. Staicoff noticed that defendant, who was sitting in his bedroom with his father and Marsala, had bloodstains on his chest and upper body.

Officer David Mooshegian of the Madison police department testified that upon arriving at the Urioste home he observed that defendant was seated in the kitchen, shirtless, and that on his chest was a fresh, red, liquidy substance. Defendant's actions did not seem bizarre or disturbed to Mooshegian, who had known defendant for approximately 15 years and who transported defendant to the Madison city jail. Upon arrival, defendant gave booking information correctly, except for the numbers of his address.

Detective Paul Bargiel of the Madison police department testified that he recovered a knife under a pile of brush in a vacant lot just north of the victim's home. The weeds in the lot were trampled down, making a trail from the edge of the Rodgers' yard and then to the alley which ran between the Rodgers' and Urioste's residences.

Bargiel further testified that he observed blood on the chest and hands of defendant at the police station. When defendant saw that Bargiel intended to photograph this condition, he tried to remove the blood by licking his fingers and wiping it off. Prior to questioning defendant, Bargiel advised him of his *Miranda* rights and defendant indicated that he understood, mentioning that he had been previously advised of his rights and that he knew about his rights from "seeing it on TV." Upon being questioned regarding the incident, defendant stated: "I can't help that somebody who look [*sic*] like me goes into people's houses and kills people."

During Bargiel's conversation with defendant, he appeared coherent and was cooperative, although he did not want to be photographed. Bargiel stated that defendant recognized him and called him by name without Bargiel having to introduce himself. There was nothing about the defendant's demeanor that suggested he was disturbed or did not understand where he was.

Bargiel identified photographs he had taken at the scene and at the Urioste residence, including People's exhibits 34 and 35, photographs of a trash container and a gate located at the rear of the Urioste residence which were smeared with a red substance. Bargiel also identified photographs of Alice Stewart, a resident of Carbondale Manor Nursing Home with whom defendant had previously engaged in sexual relations. Bargiel testified that Ms. Stewart was completely noncommunicative and in his opinion was unable to consent to anything. Bargiel's investigation showed that while staying at Carbondale Manor, defendant had gotten from his room to Alice Stewart's room by removing the window screens

and traveling a very intricate route around the outside of the complex. Bargiel discovered that defendant had had numerous contacts with Ms. Stewart and other female residents, despite being instructed repeatedly to refrain from such conduct.

The parties stipulated that the autopsy report, showing the victim's cause of death as loss of blood due to stab wounds of the front and back of the chest, could be admitted into evidence. It was also stipulated that the testimony of Judge Lola Maddox, given at the hearing on defendant's motion to suppress, would be considered at trial.

Judge Maddox testified that as an associate judge of the Third Judicial Circuit she had advised defendant of his rights at his first appearance on August 11, 1986. During his appearance, defendant appeared agitated and tried to interrupt the judge several times to ask questions. After informing defendant of the charges, including two counts of murder, and explaining his rights and the possible penalties, defendant asked Judge Maddox how he could be charged with two murders when he had killed only one person in his life. Judge Maddox told defendant that "he didn't want to ask me any questions like that and he didn't want to say anything else, and he ought to wait to talk to his lawyer."

Judge Maddox indicated that defendant's statement was volunteered; she had asked him no questions other than whether he understood what she was telling him. Judge Maddox identified documents dated November 17, 1982, which adjudicated defendant a disabled adult and appointed his father as guardian. The judge stated that she knew the defendant "had some problems," but that he appeared coherent, and to understand what was occurring, giving affirmative responses when asked whether he understood his rights. Had it appeared that he did not understand, Judge Maddox testified that she would have done something else.

Mark Johnsey, a crime scene technician with the Illinois State Police, collected several items from the victim's bedroom, including a bed sheet and a torn condom package. He also administered a vitullo sexual assault kit on the victim and collected several items of clothing from the victim and defendant. Johnsey lifted a latent palm print from the top side of the bathtub on the first floor. This physical evidence, as well as the knife received from Detective Bargiel, was submitted by Johnsey to the Fairview Heights lab for testing. David Peck, a forensic scientist specializing in latent print examinations, testified that the palm print from the bathtub matched the left palm on the inked fingerprint card of defendant. Peck found no suitable latent prints on the knife.

Dennis Aubuchon, a forensic serologist employed at the Illinois State Police Crime Lab in Fairview Heights, testified that the victim's

vitullo kit showed trace seminal material, as did her undergarments. However, due to the small amounts of semen present, no males could be excluded. Aubuchon's tests on the knife and defendant's undershorts revealed bloodstains of general blood type A, which could have come from the victim but could not have come from defendant. The general blood type A discovered occurs in approximately 40% of U.S. Caucasians and 27% of U.S. blacks.

A report on the hair samples examined in the case revealed no interchange of hairs between the victim and defendant among the hair collected from the victim's bed, pubic hair combings, and debris from defendant's shoes and clothes. Red, white and blue fibers were found both in the victim's bed and on defendant's shirt and pants. Although some hairs found on the victim's sheet were dissimilar to those of either defendant or the victim, hair standards from other persons living in the victim's home were not submitted for comparison.

■ The trial court, in rendering its verdict, found that the State had proven defendant guilty beyond a reasonable doubt of each of the crimes charged. The testimony of a single witness, if positive and credible, is sufficient to sustain a conviction even though the testimony is contradicted by the accused. (*People v. Martin* (1983), 112 Ill. App. 3d 486, 500, 445 N.E.2d 795, 807.) Here, Mrs. Rodgers' identification of defendant as her daughter's assailant was corroborated by other witness testimony, physical evidence, and by defendant's statements.

■ Renee Rodgers saw someone who looked like defendant leaving her home the morning of the murder. She and Kenneth Click testified to defendant's attempts to enter her home through a window several days earlier. Defendant's palm print was discovered on the top side of the bathtub in the Rodgers' bathroom, and evidence suggested that the murderer entered through the bathroom window after removing the screen. The court also heard testimony regarding defendant's behavior at Carbondale Manor, where he had intercourse with patient Alice Stewart after similarly gaining entry to her room through a window.

Police officers arriving at defendant's home shortly after the murder saw blood on defendant's upper chest or neck and on his hands. At various times, defendant made attempts to camouflage the blood with blood from a previously closed cut on his thumb and to wipe off the blood when he learned that he was to be photographed.

Lab tests showed that bloodstains on defendant's undershorts were general blood type A, the victim's blood type, and could not have been defendant's blood. Type A bloodstains were also present on the knife that police discovered in a brush pile along a path from the victim's yard to an alley leading to defendant's home.

Under *Martin*, this evidence would be sufficient to convict defendant, even had he contradicted it. Here, however, defendant's admissions to Deputy Marsala and to Judge Maddox give additional support to the court's finding of guilt. Therefore, given the variety and strength of the evidence against defendant, we cannot say that the court's determination of guilt was in error.

Defendant further claims that the trial court erred in finding defendant guilty but mentally ill, where the State failed to prove defendant's legal sanity beyond a reasonable doubt. Section 6—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a)) provides that a person is not criminally responsible for his conduct if at the time of the conduct, as a result of a mental disease or defect, he lacks substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. A defendant who raises the defense of insanity has the burden of proving such by a preponderance of the evidence, while at the same time the State has the burden of proving sanity beyond a reasonable doubt for purposes of a guilty but mentally ill verdict. *People v. Fierer* (1988), 124 Ill. 2d 176, 185, 529 N.E.2d 972, 977; Ill. Rev. Stat. 1985, ch. 38, pars. 3—2(b), 6—2(e).

It is clear that the question of a defendant's mental state at the time of an offense is a matter for the trier of fact, and a determination of sanity will not be reversed unless it is so manifestly against the weight of the evidence as to create a reasonable doubt of sanity or so palpably erroneous as to indicate it was the result of passion or prejudice. *People v. Snowden* (1986), 147 Ill. App. 3d 763, 770, 498 N.E.2d 612, 617.

In the instant case, the following evidence was introduced, *inter alia*, concerning defendant's mental condition. Felix Urioste, defendant's father, testified that in November 1981, defendant suffered a closed head injury in an accident. While at a hospital, defendant ceased breathing for a time and suffered brain damage from the lack of oxygen. After being comatose for three months, defendant regained consciousness and began a long rehabilitation period.

Mr. Urioste testified that during the 3½ years defendant lived at home following his injury, he basically followed the rules of the house except, at times, when he chose not to follow them. In 1984, defendant began exhibiting self-destructive behavior, cutting or stabbing himself on several occasions. In May 1986, following a physical confrontation with his father, defendant was admitted to Carbondale Manor Nursing Home. Mr. Urioste was aware that defendant had made suggestive comments to nurses at a hospital where he had recuperated following his accident,

and recounted incidents where defendant had made an embarrassing statement to a clerk at the grocery store and had propositioned an elderly neighbor.

The parties stipulated that the testimony of William Carnagey, given at an Illinois Department of Public Health hearing on March 11, 1987, would be admitted into evidence at trial. Mr. Carnagey was a head-injury specialist who had founded the program "Outreach Neuro Rehab," which worked exclusively with adults who had sustained a traumatic brain injury. Carnagey testified that sexual frustration was very common among head-injured people. Carnagey further testified that defendant's admission interview revealed a high degree of intelligence; defendant was perfectly capable of carrying on an adult conversation. Based on Carnagey's observation of defendant, he felt that defendant's IQ was still very close to normal or even, perhaps, slightly higher.

Carnagey did not consider defendant disturbed but rather blamed defendant's breaking of the rules at Carbondale Manor on mischievousness. Defendant was very manipulative and cunning at times, exhibiting the fairly unique characteristic among the head-injured of expressing remorse for his wrongdoings. Carnagey testified that defendant's neglect or abuse of the rules was fairly common among the head-injured people in his program. Defendant exhibited impulse control problems and did not seem able to anticipate the consequences at the time of committing violations, although he owned up to them afterwards and exhibited remorse. Carnagey testified that it is not uncommon following a head injury for aggressive behavior to result. However, defendant was transferred from Carbondale Manor following a May 25, 1986, incident where he was found in resident Alice Stewart's room forcing sexual desires upon her, as Carnagey feared that defendant's behavior might be becoming more aggressive.

Dr. Lawrence Taliana, a clinical psychologist, testified for defendant. Dr. Taliana saw defendant on eight separate occasions beginning in December 1986, at the Madison County jail. In addition to his observations and interviews with defendant, he performed standard tests. Defendant's reading and mathematic scores were at the sixth-grade level and his full-scale IQ was 74.

Dr. Taliana diagnosed defendant's condition as moderate to severe brain damage, an organic mental disorder, with impairment of intellectual functions and organic personality disorder. He explained that the diagnosis of organic personality disorder meant that predispositions that likely existed before defendant's injury had become exaggerated. Defendant showed a decrease in control over impulses, specifically sexual impulses, and decrease in control of aggressive behaviors. Dr. Ta-

liana testified that defendant's impulsive behaviors showed a lack of planning ahead that was often seen in brain disorders caused by oxygen deprivation. Dr. Taliana testified that defendant's condition would have existed on August 8, 1986, and that his condition was classified as a mental illness by the American Psychiatric Association.

In answer to a hypothetical based on the facts herein involved, Dr. Taliana testified that defendant would have had a great deal of difficulty controlling his behavior and impulses and that his motivation toward sexual activity had been heightened by his injury. Defendant might have had some minimal understanding of the repercussions of his acts but that the severe impairment was in his impulse control. Dr. Taliana felt that defendant could not conform his conduct to the requirements of law "in the usual sense of a normal human being."

On cross-examination, Dr. Taliana admitted that not all brain-damaged people commit crimes or are incapable of appreciating the criminality of their acts or of conforming to the law. Dr. Taliana found no evidence of psychosis in his examination of defendant and felt that defendant was competent to stand trial. Dr. Taliana was presented with an incident at Carbondale Manor where defendant made a sexually suggestive move toward a nurse and, when told to stop, asked the nurse to excuse him because he was brain-damaged. Dr. Taliana agreed that defendant's remark could be interpreted as defendant's manipulation of his head injury as an excuse for his actions. Dr. Taliana also agreed that the action of bringing a knife to the victim's home could indicate premeditation and planning and that hiding the knife afterwards, lying to police, and attempting to conceal evidence of the murder would suggest an appreciation of the ramifications of one's acts.

Dr. David Warshauer, the chief psychologist at the Anna Mental Health and Development Center (Anna), testified for the State in rebuttal. Dr. Warshauer interviewed defendant upon his admission to Anna in May 1986 and determined him to be alert and oriented, with no evidence of psychosis. While a patient at Anna, defendant followed directions, was cooperative, and exhibited mostly appropriate behavior. Although defendant had suffered brain damage, Dr. Warshauer observed nothing in his behavior that would suggest that, as a result, he was unable to conform to the rules and regulations placed on him or to appreciate the consequences of his acts. Defendant's brain damage, itself, would not necessarily diminish his ability to appreciate the criminality of his acts and to conform his conduct as required. Further, the fact that defendant did not follow the rules at all times could mean that he just did not want to follow them rather than he was unable to follow them.

Based upon the facts surrounding the victim's murder and on his

knowledge of the defendant while at Anna, Dr. Warshauer expressed an opinion that defendant was able to appreciate the criminality of his acts at the time of the crime and that he could conform his conduct to the requirements of the law. Dr. Warshauer testified that defendant's planning the act and hiding the knife afterward demonstrated that he appreciated the criminality of the act and that he was able to conform to the law.

On cross-examination, Dr. Warshauer agreed that defendant had poor impulse control and that while at Anna defendant was on medication to decrease physically aggressive behavior. Dr. Warshauer acknowledged several incidents where defendant had failed to follow the rules of Anna, including an attempt to choke a female employee, inappropriate sexual behavior, and beligerence to staff members. However, at the time defendant was discharged from Anna, Dr. Warshauer felt that defendant was not exhibiting any great inability to control his impulses. Dr. Warshauer stated that the disorder suffered by defendant was a mental illness which impaired defendant's thinking. However, the fact that defendant had shown poor judgment and poor impulse control would not indicate that he was unable to appreciate the wrongfulness of his acts or to conform to the requirements of the law.

Carbondale police officer John Sytsma testified that he had arrested defendant at Carbondale Manor on May 25, 1986, following defendant's sexual encounter with Alice Stewart. Defendant told Sytsma that something had snapped in his mind and that he could not help himself. However, defendant also told Sytsma "you can't rape the willing." Defendant was surprised when Ms. Stewart spoke during the sexual encounter; he did not think the incident was a "big deal" because he thought Ms. Stewart could not talk. The State's Attorney of Jackson County declined to prosecute due to defendant's mental condition.

Virginia Roberts, the former administrator of Carbondale Manor, testified that defendant was one of the higher-level head-injured patients at the facility. Ms. Roberts stated that defendant had a number of behavioral problems, among them leaving the facility and sexual problems with other patients. Ms. Roberts testified that defendant tried to manipulate the staff and had told her there was nothing she could do to him because he was a head-injured patient. Ms. Roberts felt that defendant knew the difference between right and wrong and what the rules were, but that he conformed to them only when he wanted to do so.

In announcing its verdict, the trial court found that defendant had established that he was suffering from moderate to severe organic brain damage, but that it was not to such an extent that it prevented him from appreciating the criminality of his conduct or conforming his con-

duct to the requirements of the law. The court further found that defendant was suffering from a mental illness at the time of the crimes and that he was therefore guilty but mentally ill of the crimes charged.

██ Defendant argues that the testimony of Dr. Warshauer, the State's expert, was so weak and self-serving that it failed to rebut the testimony of the defense expert, Dr. Taliana. However, in determining the question of sanity, the trier of fact may accept one expert's opinion over that of another. *People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 99, 524 N.E.2d 1112, 1116.

In *Snowden*, this court affirmed a finding of guilty but mentally ill where, as here, defendant's expert witness testified that defendant was unable to conform his conduct to the requirements of the law while the State's expert witnesses had contrary conclusions. The *Snowden* court observed that the trial court had relied upon the opinions of the State's experts, as well as evidence of the circumstances surrounding the offenses, to find that the defendant was legally sane. (*Snowden*, 147 Ill. App. 3d at 770-71, 498 N.E.2d at 617.) The facts in *Snowden* illustrated a pattern by the defendant of deliberate and controlled actions, including planning the crime, concealing his identity, and escaping when he was about to be discovered, that belied his defense of insanity. 147 Ill. App. 3d at 771, 498 N.E.2d at 617-18.

In the instant case, the trial court similarly found that the opinion of Dr. Warshauer and the State's other rebuttal witnesses, together with the circumstances surrounding the offenses, required a finding that defendant was not insane. Defendant's acts demonstrated premeditation and planning, together with efforts to escape and to cover up evidence of his committing the crimes, rather than an inability to conform his conduct to the requirements of the law. The trial court was free to accept or reject the testimony of the various witnesses, and we cannot say that its decision was improbable or unreasonable. See *Tylkowski*, 171 Ill. App. 3d at 100, 524 N.E.2d at 1117.

██ █ Defendant next argues that the statutory scheme for the insanity defense, which requires a defendant to prove insanity by a preponderance of the evidence (Ill. Rev. Stat. 1985, ch. 38, pars. 3—2(b), 6—2(e)), and the guilty but mentally ill (hereinafter GBMI) finding, which requires the State to prove sanity beyond a reasonable doubt (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j)), is irreconcilable and unconstitutional as applied to him. However, as defendant admits, this court has previously found the insanity statute to be constitutional insofar as it places the burden on the defendant to prove his insanity by a preponderance of the evidence (*People v. Hightower* (1988), 172 Ill. App. 3d 678, 526 N.E.2d 1129), and the GBMI statute has been held not to violate

defendant's due process and equal protection rights. *People v. Smith* (1984), 124 Ill. App. 3d 805, 465 N.E.2d 101.

In *Fierer* (124 Ill. 2d at 189, 529 N.E.2d at 977), the supreme court discussed the interplay between the insanity and GBMI statutes, stating:

> "Under this scheme, a theoretical class of defendants exists who cannot be found insane and thus not guilty by reason of insanity, because they have not carried their preponderance burden, but who also may not be found GBMI because their noninsanity has not been proved by the State beyond a reasonable doubt. In other words, defendants whose sanity is a close question, the very group one would think should be covered by the GMBI verdict, may not be found GBMI because they fall into the gap between 'preponderance' and 'beyond a reasonable doubt.' "

However, the court declined to pass on the constitutionality of the insanity/GBMI scheme, stating that whether that interrelationship is so awkward as to be unconstitutional was not properly before the court. *Fierer*, 124 Ill. 2d at 189, 529 N.E.2d at 977.

■ It is similarly unnecessary for this court to decide the question, where we have affirmed the trial court's finding that the evidence established defendant's sanity beyond a reasonable doubt. Because defendant, therefore, is not within the class of persons identified by the court in *Fierer* as falling into the gap between "preponderance" and "beyond a reasonable doubt," the statutory scheme has been applied constitutionally to him. A person to whom a statute may be applied constitutionally cannot challenge that same statute on the grounds that it could, in another context, be applied unconstitutionally to another party. *People v. Gully* (1986), 151 Ill. App. 3d 795, 798, 502 N.E.2d 1091, 1093; *People v. Holder* (1983), 96 Ill. 2d 444, 449, 451 N.E.2d 831, 833, *cert. denied* (1984), 467 U.S. 1241, 82 L. Ed. 2d 820, 104 S. Ct. 3511.

■ Defendant next contends that the trial court erred in denying his motion to suppress incriminating statements made to Detective Bargiel, Deputy Marsala, and Judge Maddox. Upon review, a trial court's determination on a motion to suppress will not be reversed unless it is against the manifest weight of the evidence, and evidence presented at trial may be considered in addition to the evidence presented at the suppression hearing. *People v. King* (1986), 109 Ill. 2d 514, 525, 488 N.E.2d 949, 955, *cert. denied* (1986), 479 U.S. 872, 93 L. Ed. 2d 173, 107 S. Ct. 249.

■ ■ The burden is on the State at a suppression hearing to show by a preponderance of the evidence that defendant's confession was voluntarily given. (*King*, 109 Ill. 2d at 525, 488 N.E.2d at 955; *Peo-

*ple v. Nau* (1988), 167 Ill. App. 3d 338, 349, 521 N.E.2d 177, 185.) The State must similarly show by a preponderance of the evidence that a defendant voluntarily and knowingly waived his *Miranda* rights. (*Nau*, 167 Ill. App. 3d at 349, 521 N.E.2d at 185; see also *People v. Bernasco* (1989), 185 Ill. App. 3d 480, 493, 541 N.E.2d 774, 782, *appeal allowed* (1989), 127 Ill. 2d 622, 545 N.E.2d 116.) Given the evidence of record, we cannot say that the trial court's finding that the State sustained these burdens was against the manifest weight of the evidence.

■■■ It is clear that evidence of limited intellectual capacity is not sufficient, of itself, to indicate that a defendant is incapable of waiving his constitutional rights and making a voluntary and knowing confession. (*People v. Murphy* (1978), 72 Ill. 2d 421, 437, 381 N.E.2d 677, 685; see also *Bernasco*, 185 Ill. App. 3d at 489, 494, 541 N.E.2d at 779, 783.) Rather, the United States Supreme Court, in *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 93 L. Ed. 2d 473, 482, 107 S. Ct. 515, 520, has found that coercive police activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the due process clause. While the mental condition of a defendant may be a significant factor in determining the voluntariness of a confession, it does not "by itself *** dispose of the inquiry into constitutional 'voluntariness.' " (*Connelly*, 479 U.S. at 164, 93 L. Ed. 2d at 482, 107 S. Ct. at 520.) The court further stated that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context." 479 U.S. at 169-70, 93 L. Ed. 2d at 486, 107 S. Ct. at 523.

In the instant case, none of the statements which were the subject of defendant's motion to suppress was made as a result of coercion by police or other authorities. Defendant was given *Miranda* warnings immediately upon his arrest, and he stated that he understood them. At the police station, Detective Bargiel also gave defendant *Miranda* warnings and defendant informed him that he had heard the *Miranda* warnings previously and that he understood them. Defendant then volunteered the statement, "I can't help that somebody who look [*sic*] like me goes into people's houses and kills people."

■■■ Defendant similarly volunteered his confession to Deputy Marsala and continued to discuss the crimes although Marsala interrupted defendant and admonished him according to *Miranda*. Judge Maddox testified that at defendant's first appearance, the defendant questioned how he could be charged with two murders when he had killed only one person in his life, without any prompting from the court. Therefore, where none of these statements was made as a result of interrogation, much less coercion by the authorities, under *Connelly*, defendant's state-

ments were voluntary, as was his waiver of his *Miranda* rights.

■■ However, analysis of the validity of a waiver of defendant's fifth amendment rights does not cease upon a finding of voluntariness; besides being voluntary, the waiver must be knowing and intelligent. (*Bernasco*, 185 Ill. App. 3d at 492-93, 541 N.E.2d at 782.) To be knowing and intelligent, "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran v. Berbine* (1986), 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141.) Only if the totality of the circumstances "reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." 475 U.S. at 421, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141.

■■ In *Bernasco*, this court affirmed a trial court's order suppressing the confession of a 17-year-old defendant, finding that the defendant did not knowingly and intelligently waive his fifth amendment rights because of his " 'sub-normal intelligence, his inability to comprehend what his rights were, and his fright of the situation.' " (*Bernasco*, 185 Ill. App. 3d at 490, 495, 541 N.E.2d at 780, 783.) Here, however, the evidence established that defendant possessed the capacity to waive his rights knowingly and intelligently. Both Dr. Warshauer and Dr. Taliana found no evidence of psychosis in defendant. William Carnagey testified that, based on defendant's verbal skills, his IQ was very close to normal or perhaps slightly higher than normal. Both Detective Bargiel and Deputy Marsala believed that defendant understood when they informed him of his *Miranda* rights. Further, Bargiel, Marsala, and Judge Maddox all felt that at the time defendant made statements to them, he understood where he was and what he was doing. We believe that this evidence is sufficient to conclude that defendant did knowingly and intelligently waive his *Miranda* rights. Thus, the trial court did not err in denying defendant's motion to suppress his statements.

Defendant's final contention is that the trial court abused its discretion in sentencing him to a 40-year term of imprisonment for murder given the defendant's mental condition and the evidence presented in mitigation. Defendant's claim, however, is without merit.

■■■ The standard for reviewing sentences is whether the trial court abused its discretion (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 545), and the reviewing court must give great weight to the sentence the trial court imposes. (*People v. Generally* (1988), 170 Ill. App. 3d 668, 677, 525 N.E.2d 106, 111.) While rehabilitation is one consideration, the court must also consider the nature of the

crime, the protection of the public, deterrence, and punishment. (170 Ill. App. 3d at 677, 525 N.E.2d at 111, quoting *People v. West* (1977), 54 Ill. App. 3d 903, 909, 370 N.E.2d 265, 270.) A defendant found guilty but mentally ill may be sentenced to any sentence that may have been ordered for a defendant found guilty without a finding of mental illness. Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—6(a).

In the instant case, the trial court's remarks at sentencing show that it considered the evidence presented at the sentencing hearing and the statutory factors in mitigation. The court's remarks also show that it gave serious consideration to defendant's mental condition:

"[N]o court can bring back a life or take away brain damage. A Judge can only do what the law empowers him to do and imposes a duty upon a Judge to do what that law requires.

It's my duty, Mr. Urioste, to sentence you and in doing that I must balance in addition to considering all the other factors *** your potential for rehabilitation against the necessity [for] protection of the public."

The court further announced that it was making the strongest recommendation to the Department of Corrections that defendant be placed in the Chester Mental Health facility, or in some other secure mental institution, for the duration of his sentence. Thus, where the sentence ordered by the trial court recognized both the need to provide treatment for defendant and the need to protect the public, no abuse of discretion exists.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

LEWIS, P.J., and GOLDENHERSH, J., concur.