THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY HOOTS, Defendant-Appellant.

First District (2nd Division)   No. 1—88—3423

Opinion filed March 31, 1992.

Randolph N. Stone, Public Defender, of Chicago (Roland P. Alwin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Michele I. Lavin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Following a bench trial, defendant, Larry Hoots, was convicted of murdering his girl friend, Joan Brady (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), and sentenced to 27 years in custody of the Illinois Department of Corrections. He argues on appeal that (1) the finding of guilty but mentally ill, as opposed to insane, was against the manifest weight of the evidence; and (2) the court used an incorrect standard of proof in evaluating his insanity defense. We affirm, for reasons which follow.

Because defendant's mental condition was at issue, a lengthier account of trial evidence must be set forth for a complete understanding of this case. Thomas Patrick Brady, Joan's son, testified that he lived with Joan, his sister and younger brother. Defendant visited their home a few times per week. Joan dated defendant for approximately one year. In January 1986, she indicated that she did not want to continue her relationship with defendant. He heard her tell defendant that she wanted to have cosmetic surgery, which defendant opposed, and did not want to see him for the eight-week recovery period. On April 14, 1986, by telephone, Joan told defendant twice that she did not want to see him. At 10:15 p.m. on Tuesday, April 15, when Thomas arrived home, he saw defendant's car parked in back. All house lights were off. Although defendant had stayed over on a front room couch three to five other times, it was unusual for a Tuesday night, because Joan had to awaken early for work the next day.

Thomas entered the kitchen, turned on the light and noticed an empty survival knife sheath on the counter, which was normally kept with the knife in a drawer. Joan, who had been sleeping, entered the kitchen. She then spoke to defendant, who she then learned was in the front room. He falsely denied taking the knife. Thomas, who was concerned about the missing knife, listened from the porch, watching television. Joan scolded defendant, telling him to stop acting like a baby. At some point, defendant returned the knife to the victim, who put it in a drawer. After 45 minutes, Thomas went to bed in the basement. His sister, Colleen, was asleep upstairs, and his younger brother was away at college. He heard no more conversation.

Thomas awoke to find State Troopers and Chicago police in the dining room area. He reentered the front room and found Joan lying in a pool of blood at the bottom of the steps leading upstairs. A trail of blood led from the front room couch to her body. He gave the police two statements, informing them that defendant was possessive

and jealous. He noticed nothing unusual about defendant's behavior and never saw him go into a trance-like state.

Illinois State Trooper William Atkins testified that on April 16 at about 1:45 a.m. he saw defendant, through closed circuit television, enter the district headquarters at Harlem and Irving Park in Chicago. Defendant walked around in the lobby, went back to the entrance doors and struck them twice, and eventually proceeded up the stairs to the second floor where Officer Atkins was located. Defendant opened the office door and asked for help. Defendant then twice informed Officer Atkins "I think I've killed my girl friend." Defendant was handcuffed. The officer noticed that defendant's left hand was "tacky," "sticky" and "covered in blood." Defendant revealed his girl friend's address and was turned over to Chicago police. Officer Atkins described defendant as confused and a "wandering type." He responded to questions, but was quiet and hung his head down. Defendant had no trouble understanding or carrying out the officer's instructions. There was an odor of alcohol on his breath; however, he did not appear to be intoxicated.

Chicago police officer Phillip White testified that on April 16, he went to State Police headquarters and received a prisoner from Officer Atkins, whom he transported to the Area Five police station. He recalled nothing unusual about the prisoner.

Chicago police officer Rutkowski, after having been given the address of the victim, investigated the scene of the occurrence. Upon ringing the doorbell and receiving no response, he entered the house through the rear door, which was open. No lights were on. He found Joan's body in a hallway.

Chicago police officer Alfred Klaser, assigned to the Chicago police crime laboratory for 21 years, asserted that at 2 a.m. he arrived at the scene. He observed a stab wound which lacerated the right side of the victim's neck. She was lying in a large pool of blood. Blood was found on the living room couch, carpet and inner handle of the exterior storm door. He recovered a brown-handled knife, on which the victim's blood was found, from the living room area carpet.[1]

After processing the crime scene, Officer Klaser went to the State Police station, where defendant was arrested. He examined defendant's red Ford station wagon in the parking lot and found blood on the steering wheel. Next, he proceeded to the Area Five vio-

---

[1]This was not the same hunting knife located in the victim's kitchen, but was one defendant brought with him to the victim's house.

lent crime unit, where he photographed defendant, whom the officer identified in court. Defendant agreed to being photographed. Defendant, when asked, was able to move his watch up his arm and turn his hands front and back. He took blood samples from defendant's hands, for crime lab analysis. These samples later were found to contain the victim's blood.

Assistant State's Attorney (ASA) Margaret Anne Glass, assigned to the felony review unit, testified that she spoke to defendant at the Area Five station after speaking to Thomas, his sister Colleen and Officer Atkins. Detective Allen Jaglowski was present. Defendant was given and understood each of his *Miranda* rights, but requested that the detective leave before he would give a statement; the detective complied.

Defendant told ASA Glass that he knew and loved Joan for about one year before she was stabbed to death. He asked her to marry him around Christmas, but the timing was not right due to her commitments to her sons, who were still in college. Defendant assumed that they planned to marry. On the night of the incident, defendant had five to six beers in a tavern and then went to the victim's home. He parked in the back as usual, entered through the back door, went into a kitchen drawer and removed a knife from its sheath. He left the sheath on a counter and went to the front room, where he sat alone on the couch. Shortly thereafter, Thomas arrived home. Defendant later returned the knife to the victim after admitting he had it. Defendant did not know why he went to the house that evening or why he took the knife into the living room with him.

The victim entered the living room and sat on the couch next to him. His drinking upset her. She previously had told him not to take nerve pills, which he stopped taking after she helped him through a depressing time. While he was in the military in Thailand he smoked marijuana once, but never abused liquor or drugs. Joan told him he could not stay there that night. He left through the back door and walked around the house. The victim let him in the front door, but again she told him he could not stay. On the morning of April 16, defendant left the house and got in his car, intending to go home. As he was driving he became aware of blood, fresh and wet, on his hands. He drove to a State Police station, where he was arrested. He did not know why he would stab to death the woman he loved. He did not recall thinking of or actually hurting her.

Defendant signed each page of the statement handwritten by ASA Glass after he read it aloud and changed a transposed date. His responses were coherent. He never appeared in a trance-like state.

ASA Glass noticed no change in defendant's demeanor when he spoke of Vietnam.

Detective Jaglowski testified that defendant orally told him substantially the same sequence of events prior to giving the written statement to ASA Glass. Defendant indicated he had no past mental problems, nor was he taking medication. Defendant's answers were very responsive. After being told they wanted to inventory his jacket and pants due to bloodstains, defendant voluntarily relinquished them. Defendant had no problem donning a paper suit or gown.

The State and defense stipulated that the cause of death was a stab wound to the neck lacerating the victim's carotid artery and jugular vein, causing massive bleeding. They also stipulated that the victim's blood was found on defendant's jacket and blue jeans.

The State rested its case in chief. Defendant's motion for a finding as a matter of law was denied.

Dr. John George Loesch, a board-certified psychiatrist, testified for the defense. He came into contact with defendant on May 9, 1986, at River Edge Hospital on referral from Dr. Marvin Schwarz, defendant's rebuttal expert. Dr. Loesch saw defendant three times per week to evaluate his treatment during the four- to six-week period he was in the hospital. Psychological and neurological tests were also taken. Dr. Lawrence Heinrich, defendant's treating psychologist, asserted that he first saw defendant on May 9 or 10, 1986, and met with him about five times per week until approximately June 18. Subsequent to discharge, they met for 9 to 10 months.

Both Doctors Loesch and Heinrich asserted that at the time of the offense, defendant was suffering from a mental disease which deprived him of the substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. Both stated that if a policeman had been standing next to defendant at the time of the occurrence, he would not have acted differently. He would have been unaware of the policeman, the victim and himself because he was so absorbed in his internal depressive state. Subsequent testing indicated that his sense of reality diminished at times.

Doctors Loesch and Heinrich also testified to defendant's partial memory loss regarding Joan's death. Defendant gave a fragmented narrative in which he recalled visiting her, but was unsure of what happened; however, he recalled going to the police and indicating something bad had happened. Dr. Loesch related that defendant could not recollect key stages in the sequence of events surrounding the homicide. The amnesia may have started as early as the Monday night before the occurrence, very typical of the fragmented type of amne-

sia. His conduct at the police station could be explained as his coming out of this fragmented condition. In his opinion, defendant was not malingering; however, an MMPI test given to him showed possible malingering by attempting to present a false claim of mental illness. The test also showed that defendant had no formal thought disorders. Regarding defendant's diaries, which were written at the hospital after the murder by defendant at the doctors' suggestion, Dr. Loesch asserted it would take a very skilled literary person to concoct the confusion they present.

Dr. Loesch asserted defendant had symptoms of "personalization; depersonalization," where he felt as though he was outside of his body the night of the homicide. A fragmentation and breakdown in his ego functions causing disassociation occurred, resulting in an outburst of behavior which could no longer be adapted to reality.

Doctors Loesch and Heinrich observed defendant in a trance-like state during conversations about loss, memories of his girl friend and the "kind of relationship he never had before in his life." Defendant would lose contact and become so self-absorbed and withdrawn that he was no longer affected by external stimuli, indicating this was like a "petite mall seizure." Defendant's ex-wife, interviewed by Dr. Heinrich, described similar trance-like states. During one such trance, Dr. Heinrich observed defendant clench his hands and, when asked where he was, defendant responded "I think I'm in Vietnam." He believed this was a thought deviation disorder.

Dr. Loesch found defendant's answers to questions to be in the pathological range. He did not exhibit normal grief, but self-condemnation and suicidal ideation. This is not normal unhappiness, but deep psychological pathological depression. Defendant's fragmented memory showed that he lost contact with reality.

Dr. Heinrich also concluded defendant was severely depressed and suffered from recurrent or episodic psychotic depression, and thought disturbances that were transitory and periodic. He was sad because someone he loved was dead. His responses to questions were minimal, and he appeared confused and apathetic. He was also suicidal, which opinion Dr. Loesch shared. Most people who are psychotic are not impaired most of the time. They go in and out of these states where they lose touch with reality. Dr. Heinrich believed that defendant was depressed from the time he was in Thailand.

When asked for a trigger event, Dr. Loesch testified that it was a whole progressing, long-lasting, mental illness of a deep psychotic depression that finally intensified to a point where there was a breakdown. He added it was also due to an unresolved severe dependency

on an endorsing self-object; his existence, well-being and self worth depended on the victim. Dr. Heinrich asserted that defendant tended to form relationships with women too quickly.

Dr. Albert Henry Stipes, a board-certified psychiatrist employed by the Psychiatric Institute of Cook County (Institute), testified for the State. In his opinion, on April 15 and 16, defendant was able to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. This opinion was based upon his examination of defendant's records from the Institute, which included his social history, psychological summary and police reports, records from River Edge Hospital, defendant's diaries, as well as personally questioning and observing defendant. He diagnosed defendant as having dysthymic disorder and evidence of personality disorder. Dysthymic disorder is a chronic depressive illness characterized by appetite and sleep disturbances, depressed moods, suicidal ideation and loss of interest in a person's activities. This is different from psychotic depression, where hallucinations and delusions must occur, called major depression with psychotic features. He also relied upon a report which included information given by defendant's mother. She said that on the night of the murder he came home, talked to Joan on the telephone as usual and left the house. He probably went to a bar before coming home. After the divorce from his ex-wife, defendant was depressed, drank more and moved in with his parents, but never, in her presence, talked about suicide or demonstrated psychotic symptoms or trances.

Dr. Stipes asserted defendant's diary showed grief over loss, but no evidence of psychotic thinking. He believed defendant's memory loss was due to alcohol and hysterical amnesia, which is traumatic amnesia due to the incident itself. This would not have anything to do with defendant's thought processes at the time of the incident. He found nothing in the record to support Dr. Heinrich's diagnosis of a severely psychotic depression, adding it is unusual not to give medication, such as here, to someone diagnosed with severely psychotic depression. He asserted the cause of defendant's behavior was the result of suffering a severe rejection by the victim after rejection by his ex-wife, motivated by anger at suffering the loss.

Dr. Stipes asserted defendant's out-of-body feeling is a hysterical symptom called depersonalization. This is neurotic, not psychotic, since the individual knows what is real. Psychosis means loss of sense of reality. Motivation by severe rejection is not inconsistent with being psychotic and such a person would have been able to hold his hands out pursuant to police orders. He added that severe recurrent depres-

sion is a mental disease or defect, but this does not deprive a person of the ability to conform his or her conduct to the requirements of the law or to appreciate the criminality of his or her conduct, unless it is with psychotic features.

Dr. Michael Rabin, a clinical psychologist specializing in forensic psychology, also testified for the State. He saw defendant on April 2, 1987, and diagnosed him as having a dysthymic disorder with a mixed personality disorder. He described dysthymic disorder as a depressive neurosis with a showing of various clinical signs of neurotic depression without psychotic depression, which means no hallucinations, no delusions, no melancholy, no apathy to the point where a person is unresponsive or mute, no catatonia and no loss of reality contact. The difference between dysthymic depression and major depression is a matter of degree. In his opinion defendant was legally sane at the time of the offense. He attributed the memory loss to the ingestion of alcohol.

Defendant told Dr. Rabin that he recently had been jealous of the victim's attention to other men. He denied any instances of derealization or trance-like states or other indications of dissociative disorder. A catatonic state could be indicative of psychosis from which a person could lack the substantial capacity to appreciate the criminality of his conduct or lack the substantial capacity to conform his conduct to the requirements of the law. The sequence of actions which occurred on the night of the homicide could not have been done by one in a catatonic state, because such a person does not respond or move.

After examining defendant and reviewing his diaries and the doctors' records, Dr. Rabin found nothing to indicate defendant was suffering from a dissociative disorder, where one is unaware of what is going on around him. He also found Dr. Heinrich's diagnosis of severe depression with psychotic episodes to be unsupported by the records. The diagnosis in Dr. Heinrich's report was major depression without psychotic features. At the time defendant put the knife in the victim's neck, he was not suffering from delusions or hallucinations.

Dr. Marvin Schwarz, a board-certified psychiatrist and licensed attorney, testified as a defense rebuttal witness. He met defendant on May 12, 1986, when he was hospitalized at River Edge Hospital. During their first meeting, he spent 1½ hours with defendant. He later had discussions with Drs. Loesch and Heinrich and evaluated Dr. Rabin's psychological reports. He diagnosed defendant as suffering from schizoaffective psychosis, a disease from which defendant could lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The label se-

vere major depression with psychotic aspects is also such a mental illness. The only difference between his diagnosis and that of Dr. Loesch was technical and insignificant, adding that both his diagnosis and severe depression recurrent refer to psychotic mental illness. No anti-psychotic drugs were given to defendant because he would not agree to take them.

Dr. Schwarz explained that the term "dysthymic disorder" refers to a difference in degree from major depression. It is a depressive disorder of neurotic rather than psychotic degree. Frequently people go through long periods of time with the disorder and under stress decompensate into a major depression of psychotic degree and then return to dysthymic disorder. There is some argument as to whether such people should always be labeled with a psychotic equivalent diagnosis or whether it is correct to label them dysthymic when they are not in periods of psychotic depression and as major depression recurrent in the periods when they are psychotic.

Dr. Schwarz averred that the trance-like states were types of periodic withdrawal from reality into a period of psychotic withdrawal and ceasing to be in contact with reality. He did not think that defendant's amnesia was due to the alcohol, even assuming that defendant drank 10 beers that evening, because he was intact and coherent when he went to the police station shortly afterwards. Suddenly looking at one's hands, as defendant did, is unusual in terms of alcoholic amnesia. Additionally, his decompensation to the point of loss of awareness was episodic; his loss of awareness did not occur all the time, unlike other people. In the face of overwhelming stress, he lost control of his feelings. In doing things he normally would not do, he had to compartmentalize his thoughts and deny them to the point of amnesia.

When asked why it was not probable that, rather than being legally insane, defendant was just angry, Dr. Schwarz responded that the victim was only six years younger than defendant's mother; the relationship was one in which he had to take care of tremendous needs; and he had just lost his wife and children. Additionally, defendant does not act out his anger, but internalizes it, becoming more depressed and angry. This is his form of denial and control. In this case he turned his anger to the victim, which was very atypical and represented a breakdown of his defense system, a psychotic state in which these feelings got out and he could no longer control them.

In the opinion of Dr. Schwarz, as a result of the mental disease, defendant lacked the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. He

added that if a police officer was standing next to defendant at the time of the incident, his conduct would have been no different.

At the conclusion of all the evidence the court found defendant guilty but mentally ill.

## I

Defendant contends the finding that defendant was guilty but mentally ill, rather than legally insane, was contrary to the manifest weight of the evidence.

Defendant is not criminally responsible for his conduct if at the time of the conduct he suffered from a mental disease or defect which deprived him of the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).

The circuit court found all the doctors' testimony to be consistent with the theory that depressive illness reaches the level of legal insanity when psychotic overtones are present. The only differences in their testimony were their conclusions as to the proper interpretation of the evidence of defendant's depression. The court's finding that defendant suffered from a mental illness—some type of depression—was supported by the evidence, thereby fulfilling the first requirement of the statute.

Next, the court concluded that defendant appreciated the criminality of his act at the time of the occurrence by looking to the time immediately before and after the incident, also within the range of the evidence. Before the homicide, he was asked about the knife and first denied, then ultimately admitted, he had it. After the incident he went to the station and told the police that he thought he killed his girl friend. Based upon this evidence, the court determined that defendant appreciated and understood the criminality of his conduct.

The final issue for decision was whether defendant was able to conform his conduct to the requirements of the law. The circuit court observed that defendant had no history of psychiatric treatment before the murder. It noted that none of the lay witnesses testified to conduct which demonstrated that defendant was hallucinating or having delusions, two words that were consistently used to indicate psychotic episodes. It found the diaries unhelpful because the experts disagreed with their meanings. The court recounted defendant's conduct immediately before the homicide. Defendant parked in the usual place at the victim's home. He entered her home through the usual door. He answered "hello" when she called out to him while he was seated in the darkened room before the crime was committed. He eventually

relinquished the survival knife upon her request. The court found reason to believe that motive existed for the killing because the victim ended their relationship against defendant's will.

After reviewing the foregoing evidence, the court commented on the credibility of the State's witnesses, noting, "[t]hey don't get paid for finding someone insane or sane at the time." The court expressed concern over a defense witness. "Dr. Schwarz's testimony left me troubled *** he went to great lengths to explain how his diagnosis was the same as the diagnosis [sic] of all the other doctors, whereas the other doctors did not adopt his analysis." The court then evaluated the significances attributed by the witnesses to inconsistencies in defendant's violent behavior, and decided that they did not prove defendant delusional or out of touch with reality. Only then did the court find defendant guilty but mentally ill.

Defendant insists that his experts' testimony must be given greater weight because they observed defendant closer in time to the incident and more frequently than the State's experts. Defendant's argument is claimed to be supported by Dr. Stipes' assertion that the more time a psychiatrist spent with someone he was attempting to diagnose, the more likely he would have a complete mental and emotional picture, and that the amount of time which passes from the incident until patient observation may have a bearing on the conclusions reached. It is also alleged that this testimony contradicts the court's conclusion that the psychologists who testified were similarly situated, since no one was present at the time of the occurrence and each doctor testified as to interviews, reading reports, reading psychological tests and the interpretations of those tests by other doctors. No expert here stated that greater weight must be given to the testimony of one who followed such procedures, however; the court's finding that the experts were similarly situated, partially because none of them were present at the incident, is supported by Dr. Schwarz's testimony that to make a judgment call by extrapolating backwards, as all the experts did, is not the same as seeing the person immediately at the time of the incident.

Contrary to defendant's assertions, the circuit court was permitted to utilize its prior experiences to evaluate expert testimony. The weight to be given expert testimony is dependent upon the facts marshaled in support of the conclusions reached. (*People v. Fosdick* (1988), 166 Ill. App. 3d 491, 500, 519 N.E.2d 1102.) The court did not err by analyzing the facts before it to determine the weight to be given the testimony. Further, the court may accept one expert's testimony over that of another, and may even accept lay testimony over

that of an expert (*People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 99, 524 N.E.2d 1112), as it did by looking at the lay witnesses' observations, questioning some and accepting other expert testimony.

The question of defendant's mental state at the time of an offense is a matter for the trier of fact. Although defendant's evidence bore some persuasive qualities, the record also reveals ample evidence supporting the court's sanity finding here. In a bench trial, a determination of sanity will not be reversed unless it is so improbable or unsatisfactory as to create a reasonable doubt of defendant's sanity. *People v. Ward* (1975), 61 Ill. 2d 559, 568, 338 N.E.2d 171; *People v. Carlson* (1980), 79 Ill. 2d 564, 580, 404 N.E.2d 233; *People v. Fosdick* (1988), 166 Ill. App. 3d 491, 500, 519 N.E.2d 1102.

We cannot conclude from this record that the circuit court's findings were improbable or unsatisfactory.

## II

Defendant avers that the circuit court applied an erroneous standard of law in finding defendant guilty.

■ After the court found defendant guilty but mentally ill, defense counsel asked whether the court had found that defendant did not establish by a preponderance of the evidence initially that defendant was insane. The court replied, "I am not convinced beyond a reasonable doubt that Mr. Hoots was insane at the time that the act occurred." There is no such requirement. A defendant has the burden of proving "by a preponderance of the evidence" that defendant is not legally responsible by reason of insanity; once such evidence is established, the State has the burden of proving sanity beyond a reasonable doubt for the purposes of a guilty, but mentally ill judgment. (*People v. Urioste* (1990), 203 Ill. App. 3d 1062, 561 N.E.2d 471.) Although the remark was not objected to or raised in a post-trial motion, the evidence is closely balanced and the application of the wrong standard may have rendered a different result. (*People v. Young* (1989), 128 Ill. 2d 1, 46-47, 538 N.E.2d 453.) We find the issue is not waived.

The circuit court is presumed to know the law and apply it properly. The court need not state for the record the standard of proof employed. In determining the sufficiency of a judgment, the entire record may be searched to support the judgment. (*People v. Gutierrez* (1982), 105 Ill. App. 3d 1059, 433 N.E.2d 361.) Defense counsel never objected to or questioned the court after this statement was made. In closing argument and in rebuttal, the correct standard was argued to the court, which did not comment or indicate that it was the wrong standard. More importantly, the court later stated, "the defense did

54

raise the issue to the level where the state need[ed to] address it."
Further, the court noted, "[t]he defense was required to raise the issue. It's an affirmative defense. They did raise it. The state is obligated to meet that burden and to overcome it, and they did and that's my ruling."

A reviewing court can affirm the judgment of the circuit court where examination of the entire record shows that the court's finding was correct, even where a misstatement of the law may have been uttered. (*People v. Williams* (1991), 143 Ill. 2d 477, 485, 577 N.E.2d 762; see *People v. Thompkins* (1988), 121 Ill. 2d 401, 428, 521 N.E.2d 38.) The circuit court's finding here, based upon the evidence, was in consonance with the correct standard and must be upheld.

For the reasons set forth above, we find no reversible error and, therefore, affirm.

Affirmed.

SCARIANO and DiVITO, JJ., concur.