*In re* M.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. M.M., a Minor, Respondent-Appellant).

First District (5th Division)   No. 1—90—3244

Opinion filed October 15, 1993.

Rita A. Fry, Public Defender, of Chicago (Kim L. Sorrells, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb and Lisa Goldsand, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

After a hearing held September 10, 1990, respondent M.M., the minor in this case, was adjudicated a delinquent based upon the murder of six-month-old Rashonda Flowers and committed to the Illinois Department of Corrections, Juvenile Division.[1] The public defender, M.M.'s legal counsel, appeals his adjudication, contending: (1) that the trial court erroneously found that M.M. knowingly and intelligently waived his so-called "*Miranda* rights" and thus failed to suppress statements M.M. made to the police; and (2) that M.M. was not proved guilty of murder beyond a reasonable doubt.

For reasons that follow, we affirm M.M.'s adjudication of delinquency for murder.

The record reveals that at approximately 9:30 p.m. on May 14, 1990, Claudia Flowers was walking home from the store while pushing her six-month-old baby, Rashonda Flowers, in a stroller. As she crossed the street near the intersection of Cottage Grove and Bowen in Chicago, she heard a "pop." When she looked down at her baby shortly thereafter, she noticed blood coming from the baby's head. Claudia then picked up her baby and ran to a nearby store for help. The police were summoned and Rashonda was rushed to Michael Reese Hospital, where just hours later she died from a single gunshot wound to the head.

On the evening of May 14, 1990, Beverly Woodlaw, M.M.'s cousin, was standing in front of the store at the intersection of Cottage Grove and Bowen. She heard two gunshots, which she said came from the building located at 821 East 41st Street. After hearing the gunshots, she heard a lady on the other side of the street scream that her baby had been shot.

On the following day, May 15, 1990, Officer Cox was assigned to investigate the murder of Rashonda Flowers. Around 2:15 p.m. he traveled to 811 East 41st Street, located M.M. and told him he was being detained in conjunction with a homicide. Officer Cox informed M.M. of the rights afforded him under the *Miranda* decision and M.M. indicated that he understood those rights. M.M. then made a statement to Officer Cox. On the basis of his statement, M.M. was arrested and taken to Area One police station.

---

[1]M.M., who was born May 19, 1975, was five days shy of his fifteenth birthday when the shooting occurred. The State petitioned to try M.M. as an adult, but the petition was denied.

Later, Officer Cox went to apartment 501 within the building at 821 East 41st Street. In this apartment he recovered three shell casings from the floor underneath a window which faced south and which overlooked the intersection of Cottage Grove and Bowen. In addition, Officer Cox recovered a .22-caliber rifle from under a bed in the rear bedroom of the apartment.

At Area One Detective George Tracy and youth officer Linda Boose spoke with M.M. Each officer informed M.M. of his rights before speaking with him and in each instance M.M. indicated that he understood those rights. Assistant State's Attorneys (ASAs) Clarke Devereux and David Cuomo were then summoned to Area One to meet with M.M. These assistant State's Attorneys met with M.M., informed him of his rights, explained them to him, and then spoke with him. After hearing his statement, ASA Cuomo asked M.M. if he would repeat the statement before a court reporter. M.M. agreed and a court reporter was called. At approximately 6:30 p.m. on May 15, 1990, the court reporter arrived and recorded M.M.'s statement. After the statement was recorded the court reporter transcribed it. ASA Cuomo showed the transcribed statement to M.M., who read the first page aloud and the subsequent pages silently. M.M. made six corrections to the transcribed statement and then signed it.

According to this written statement, on the evening of May 14, 1990, M.M., Jerome Dorsett, Eddie Clark, Michael Wordlaw and Dankyira McElroy were in apartment 501 of the apartment building at 821 East 41st Street. Everyone except Eddie Clark was a cousin of M.M.'s and they used apartment 501, which was vacant, as a clubhouse. Inside the apartment they kept a .22-caliber rifle which Dorsett had purchased about three weeks earlier and which M.M. and Dorsett owned. On the evening of May 14, 1990, M.M. retrieved the gun from under a bed in the apartment, went to a window of the apartment and fired one shot out the opened window. He then gave the gun to Dorsett, who fired two shots out the window. After Dorsett fired the gun out the window, M.M. left the apartment building and learned that one of the shots had struck a baby in the head. The .22-caliber rifle which Officer Cox had recovered from apartment 501 was identified by M.M. as the gun he owned and fired from the window of the apartment on May 14th.

Prior to the adjudicatory hearing M.M. moved to suppress his inculpatory statements on the premise that his low I.Q. made him intellectually incapable of knowingly and voluntarily waiving his right to remain silent. The trial court rejected this premise and found that

M.M. had knowingly and voluntarily waived his rights. The motion to suppress was denied and the matter proceeded to adjudication.

At his adjudicatory hearing, the State presented the evidence cited above, including M.M.'s court-reported statement. In addition, the State presented the testimony of Michael Wordlaw and Dankyira McElroy, who corroborated M.M.'s statement. Both Wordlaw and McElroy testified that they were present with M.M. in apartment 501 of 821 East 41st Street on the evening of May 14, 1990. Although they admitted to using drugs that night, they testified that they witnessed M.M. and Dorsett fire the .22-caliber rifle from the window of the apartment.

M.M. was pronounced delinquent on the basis of his complicity in the murder of Rashonda Flowers. He was committed to the Illinois Department of Corrections, Juvenile Division, and now brings this appeal.

■ The first question is whether the trial court erred by failing to suppress M.M.'s court-reported statement in which he implicated himself in the shooting death of Rashonda Flowers. M.M. contends, as he did before the trial court, that he did not validly waive his *Miranda* rights. We must, however, affirm the trial court's ruling on this matter.

As a reviewing court, our inquiry is limited to determining whether the trial court's ruling on the motion to suppress was against the manifest weight of the evidence. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958; *People v. Kincaid* (1981), 87 Ill. 2d 107, 118, 429 N.E.2d 508.) The trier of fact, not the reviewing court, determines credibility of witnesses and resolves conflicts in the testimony. *People v. Rogers* (1993), 246 Ill. App. 3d 105, 614 N.E.2d 1334.

In any case considering the waiver of *Miranda* rights there are two distinct dimensions or aspects to be considered: (1) whether the confession was voluntary in that it was devoid of any external coercive forces, and (2) whether the person waiving the rights had a basic understanding of the rights and the consequences of abandoning them. *People v. Scott* (1992), 148 Ill. 2d 479, 594 N.E.2d 217; *Bernasco*, 138 Ill. 2d at 354.

In this case, M.M. does not contend that his statement was made involuntarily. For his confession to have been involuntary, in the Federal constitutional sense, M.M. would have had to show that the police used intimidation, coercion or deceptive tactics which caused his will to be overborne. (*People v. Bernasco* (1989), 185 Ill. App. 3d 480, 541 N.E.2d 774.) No allegations of police overreaching or coercion were made in this case. Rather, it is M.M.'s position that his waiver of

*Miranda* rights was not knowing and intelligent. M.M. contends that he has mental deficiencies which made him incapable of understanding the words used in the *"Miranda* warnings" as given to him by the police and assistant State's Attorneys. He further claims that his subnormal mentality made him incapable of understanding the nature of the rights he was abandoning or the consequences of abandoning them. (See *Moran v. Burbine* (1986), 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141.) Therefore, he concludes that he could not have made a knowing and intelligent waiver of his rights and his statement should have been suppressed.

When deciding this issue, the totality of the circumstances must be considered. (*Rogers*, 246 Ill. App. 3d at 113-14.) Although mental deficiency is one factor to be considered when deciding whether *Miranda* rights were validly waived, evidence of a limited intellect, alone, does not constitute proof that one was incapable of waiving constitutional rights. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) Other factors to be considered are the person's age, background, experience, and conduct. *Bernasco*, 138 Ill. 2d at 368.

Mindful of the deference that must be given to the determination of the trial court, we are unpersuaded by M.M.'s argument that the trial court's decision was against the manifest weight of the evidence. Although M.M. presented the expert testimony of a clinical psychologist who indicated that M.M. had an overall I.Q. of 71, the mental age of 10 and diminished reading and vocabulary skills (in 1988 M.M. had a fourth-grade reading level), the State presented evidence that the *Miranda* warnings were explained to M.M., who was nearly 15 years old at the time. He was able to read his statement out loud and make appropriate corrections to the statement and he had previous contact with the police and had exercised his right to remain silent on other occasions. Consequently, we affirm the trial court's finding that M.M. knowingly and intelligently waived his rights and find that M.M.'s statement was properly admitted into evidence.

The second issue on appeal questions whether there was sufficient evidence for the trial court to have found M.M. delinquent based upon murder. M.M.'s main argument is that the State's two occurrence witnesses, Dankyira McElroy and Michael Wordlaw, were under the influence of drugs at the time of the incident and, therefore, were unable to perceive the events on the evening of May 14, 1990. M.M. also contends that inconsistencies and discrepancies in the testimony of these two witnesses further indicate that their perceptions were altered and that they should not have been believed. Finally, M.M. contends that the testimony of deputy medical examiner Dr. Chamblis,

concerning the path of the bullet which entered Rashonda's head, indicated that the fatal shot could have come from ground level.

The standard by which we review a claim of insufficiency of the evidence, as conceded by M.M., is whether the evidence is so improbable, unreasonable, or unsatisfactory that a reasonable doubt of defendant's guilt is raised. (*People v. Molstad* (1984), 101 Ill. 2d 128, 461 N.E.2d 398.) In light of this standard, and the fact that we held above that M.M.'s confession was admissible, we must find that the evidence of M.M.'s guilt was sufficient.

■ Although it is true that McElroy and Wordlaw were under the influence of drugs on the evening that the shooting occurred, M.M. was unable to show through cross-examination that they were incapable of perceiving the events that took place. The testimony of these two witnesses differed only in the respect that McElroy testified that the gun was empty when M.M. gave it to Dorsett and that he heard gunshots outside, whereas Wordlaw testified that the gun was loaded when it was passed to Dorsett and no gunshots were heard from outside. These discrepancies are immaterial to the finding of M.M.'s guilt. McElroy and Wordlaw, both relatives of M.M., agreed on the fact that M.M. fired a shot out the window once and then passed the rifle to Dorsett, who fired two shots out the window.

We note, too, that Beverly Wordlaw, also a relative of M.M., testified that she heard gunshots which came from the apartment building where M.M. was present and that immediately thereafter a woman screamed that her baby had been shot. She did not hear any shots being fired at ground level. We believe that the evidence provides substantial proof of M.M.'s involvement in the shooting death of Rashonda Flowers and, therefore, we affirm the finding of delinquency.

For the above reasons, we affirm the trial court's rulings in this matter.

Affirmed.

GORDON, P.J., and McNULTY, J., concur.